**MUSIC CENTER S.N.C. DI LUCIANO PISONI & C. and Enzo Pizzi Inc., Plaintiffs,**

v.

**PRESTINI MUSICAL INSTRUMENTS CORP., Giuseppe Prestini, Miller, Canfield, Paddock, and Stone, and William E. Perry, Defendants.**

No. 93 CV 1663 (ERK).

United States District Court, E.D. New York.

Jan. 25, 1995.

---

11. For entitlement to attorneys' fees, see separate memorandum and order issued concurrently with this opinion.

Larry Klayman, Klayman & Associates, P.C., Washington, DC, for plaintiffs.

Gregory L. Curtner, Detroit, MI, Jeffrey E. Glen, Berwin Leighton, New York City, for defendants.

*CORRECTED*

*MEMORANDUM AND ORDER*

KORMAN, District Judge.

This motion to dismiss and for summary judgment revolves around a trade dispute between two manufacturers of pads for the keys of woodwind instruments. Plaintiffs are an Italian manufacturer, Music Center S.N.C. Di Luciano Pisoni & C., and a New York importer of these products, Enzo Pizzi, Inc. Defendants are Prestini Musical Instruments Corporation ("PMI"), an Arizona corporation also making keypads, its principal, Giuseppe Prestini, and its counsel, Miller, Canfield Paddock and Stone and William E. Perry, a member of that firm. Plaintiffs allege violations of Section 2 of the Sherman Act, as well as state-law unfair trade practices, theft of trade secrets, abuse of process, wrongful institution of civil proceedings and prima facie tort.

The antitrust cause of action alleges a course of anticompetitive conduct arising out of the filing of baseless or "sham" antidumping petitions and other actions before the International Trade Commission ("ITC") and International Trade Administration ("ITA") of the Department of Commerce ("Commerce"). During antidumping and countervailing duty proceedings, Commerce determines whether the pricing of goods by an importer is lower than fair value ("LTFV"), and whether the import and pricing of such goods is injuring a domestic industry in competition with the importer—a practice commonly known as "dumping." *See* Pierre F. De Ravel Esclapon, *Non–Price Predation and The Improper Use of U.S. Unfair Trade Laws,* 56 Antitrust L.J. 543 (1987) (hereinafter *"Non–Price Predation"*).

These proceedings may pose a substantial burden on their target. The foreign companies who are the subject of an antidumping investigation are presented with questionnaires seeking information about their selling practices, and, in many cases, their cost of production as well. *See Non Price Predation,* at 549. After submission of questionnaire responses, these responses are verified by Commerce officials. The verification process sometimes involves up to five investigators reviewing source documents at the respondents' corporate offices and factories for periods ranging between three days and three weeks. *Id.* There also appears to be no limit on the number of complaints a domestic industry may file, although the ITA has the discretion to terminate the investigation at any time after it determines that a petition lacks merit. *See Gilmore Steel Corp. v. United States,* 7 C.I.T. 219, 585 F.Supp. 670, 674 (1984).

Plaintiffs allege here that three sets of filings before Commerce by PMI, in 1983, 1991 and 1992, each charging plaintiffs with dumping, were without factual basis. Plaintiffs claim that the filings were designed solely to injure them competitively by forcing them to incur the cost of defending the baseless antidumping proceedings. In pertinent part, the amended complaint charges that:

20. Despite numerous blatant and *prima facie* defects, deficiencies and false statements in PMI's petitions, including the attachment of materially incorrect and false price lists, newspaper articles and other data, the ITC and [Commerce] nevertheless commenced countervailing duty and antidumping investigations. PMI and [Giuseppe Prestini] induced the initiation of these proceedings through the submission of false information.

22. The 1983 countervailing duty investigation ended with a de minimis negative finding and the antidumping investigation resulted in the imposition [of] an antidumping duty of 1.16%. This finding was subsequently overturned on appeal by the United States Court of International Trade ... which ordered the U.S. government to revoke the antidumping order imposed on Pisoni's exports to the United States ...

24. Upon information and belief, shortly after joining [Miller Canfield], Perry, having become thoroughly familiar with the Pads antidumping case while employed by the ITC, encouraged [Miller Canfield] to represent PMI and encouraged [Giuseppe Prestini] to hire [Miller Canfield].

25. In the Fall of 1991, [Miller Canfield], including Perry, entered a Notice of Appearance before [Commerce] and intervened on behalf of PMI in the administrative review of the antidumping order, forcing Pisoni to defend itself even though the U.S. Court of International Trade had ordered the exclusion of Pisoni from the antidumping order, and [Commerce] had so complied.

26. On or about August 31, 1992, and prior thereto, Defendant [Prestini] communicated with [Enzo Pizzi] and Pisoni to propose fixing prices of woodwind pads and dividing the woodwind pad markets.

27. On October 21, 1992, after plaintiffs refused to engage in the proposed unlawful anticompetitive practices of price fixing and market division, PMI, with the assistance of [Miller Canfield] and Perry, filed a new antidumping petition against Plaintiffs ... which against contained material false information about Plaintiffs' sales and other misinformation.

28. In the course of this new investigation, Perry had access to and used confidential business information relating to Pisoni and revealed such information to PMI [ ...] in violation of Commerce's rules and regulations. The release of this confidential information to Pisoni's principal competitor has caused Plaintiffs substantial competitive harm, especially since the confidential information concerned Pisoni's customers and sales, among other confidential matters.

Defendants argue that the Commerce filings at issue cannot provide a factual basis for an antitrust cause of action because such filings are subject to antitrust immunity under *Eastern Railways Presidents Conf. v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961), *United Mine Workers of America v. Pennington*, 381 U.S. 657, 669, 85 S.Ct. 1585, 1592, 14 L.Ed.2d 626 (1965), *California Motor Transport Co. v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972), and *Professional Real Estate Investors, Inc. v. Columbia Pictures Indus., Inc.*, —— U.S. ——, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (*"PRE"*). Accordingly, they move to dismiss the antitrust cause of action pursuant to Rule 12(b)(6).

The parties have submitted extensive materials and affidavits, including a full record of the results of the proceedings before the ITC and ITA relating to the allegations and findings there. Accordingly, to the extent the parties agreed at oral argument that discovery and further presentations are unnecessary as to what allegations the petitions before Commerce contained and the outcome of the Commerce proceedings, and to the extent that the motion turns on these factual issues, the motion to dismiss will be treated as one for summary judgment. Fed.R.Civ.P. 12(c).

### Discussion

■ Those who petition for governmental redress are generally immune from antitrust liability unless the petitioning activities are "sham"—intended only to conceal an "attempt to interfere directly with business relationships of a competitor." *Noerr*, 365 U.S. at 144, 81 S.Ct. at 533. Recently, in *PRE*, the Supreme Court established a two part definition for "sham" litigation:

First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under *Noerr*, and an antitrust claim premised on the sham exception

must fail. Only if the challenged litigation is objectively meritless may a court examine the litigant's subjective motivation ... —— U.S. at ——, 113 S.Ct. at 1928. Under this "two-tiered process," an antitrust plaintiff must "disprove the challenged lawsuit's *legal* viability before the court will entertain evidence of the suit's *economic* viability." *Id.*

◼ Plaintiffs urge that the broad and indistinct allegations of the complaint are sufficient to allow them to proceed to discovery as to the truth of the allegations in the petition. This position, which may have had some merit before *PRE* [1] and its requirement of a colorable claim of "objectively baseless" litigation, is now no longer tenable.

A rule permitting discovery, based solely on allegations of misrepresentation in a petition, would fail to recognize that an inaccurate petition, even one containing deliberate misstatements, might nonetheless not be so lacking in merit as to be objectively baseless. *See PRE,* —— U.S. at ——, 113 S.Ct. at 1928 n. 5 (where proceeding terminates successfully, it cannot be sham); *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States,* 10 C.I.T. 424, 640 F.Supp. 255, 257 (1986) (ITC is under no duty to terminate proceedings, even where it finds misstatements in petition, where there is still evidence of sale at LTFV); *Citrosuca Paulista v. United States,* 12 C.I.T. 1196, 704 F.Supp. 1075 (1988) (where ITC petition was flawed because petitioner lacked standing, proceeding could nonetheless go forward where Commerce had cured flaws in petition). *Cf. Franks v. Delaware,* 438 U.S. 154, 171, 98 S.Ct. 2674, 2684, 57 L.Ed.2d 667 (1978) (under Fourth Amendment, validity of a warrant is not affected by intentional misstatements of fact in supporting affidavit if probable cause exists even without considering such statements).

To allow antitrust claims based solely on broad and indistinct allegations of misrepre-

sentation and "sham litigation" to reach discovery, regardless of the role the claimed misrepresentations played, or could have played, in the prior proceeding, would predicate the viability of an antitrust complaint on a petitioner's subjective intent, and not the objective merit of its petition, and thus directly contravene the Supreme Court's holding in *PRE.* —— U.S. at ——, 113 S.Ct at 1928. Moreover, such discovery would have the effect of encouraging antitrust "strike suits", and effectively chill the First Amendment rights which *Noerr* immunity was intended to protect. *See PRE,* at ——, 113 S.Ct. at 1926.

◼ Thus, before reaching the question of subjective intent, which discovery relating to the broad allegations of misrepresentation at issue here could evidence, it is necessary to determine whether the filing of the antidumping petitions and requests for administrative review may be viewed as objectively baseless. Such a determination requires consideration, *inter alia,* of the outcome of the proceedings, including the findings made by the relevant administrative tribunals, the nature of the particular allegations of the petition or actions before the administrative agency claimed to be fraudulent or improper, and whether these claimed misrepresentations or improper actions would have been significant to the ultimate outcome or continuation of the proceeding.

### The Proceedings at Issue

#### The 1983 Petition

◼ On November 7, 1983, PMI filed the first of the antidumping petitions at issue with the ITA and ITC. The petitions were filed against the plaintiffs here, and against another, apparently unrelated, Italian manufacturer of keypads, Pads Manufacture. The petition contained information including home market price lists of Pisoni in dollars dated January 1, 1982, export price lists for

---

**1.** *See Woods Exploration and Producing Co. v. Aluminum Co. of America,* 438 F.2d 1286 (5th Cir.1971), *cert. denied,* 404 U.S. 1047, 92 S.Ct. 701, 30 L.Ed.2d 736 (1972) (pre-*PRE* claim against oil producer of filing false oil field nomination forecasts with the Texas Railroad Commission so as to reduce plaintiffs' oil field pro-

duction allowable is abuse of administrative process sufficient to support claim under antitrust laws); *Outboard Marine Corp. v. Pezetel,* 474 F.Supp. 168 (D.Del.1979) (counterclaim alleging conspiracy to submit knowingly false information to the United States Custom Service was sufficient to state claim under Sherman Act).

Prestini's pads in lira, estimated home market costs for Pisoni based on the petitioner's (Prestini's) costs when it manufactured in Italy, and the petitioner's current cost of production. *Luciano Pisoni*, 640 F.Supp. 255, 257. On December 14, 1983, the ITA published its finding that the petition provided sufficient grounds on which to initiate an investigation. 48 Fed.Reg. 55602. On December 22, 1983, the ITC issued a Preliminary Determination that there was a reasonable indication that imports of pads from Italy were materially injuring or were threatening to injure a U.S. industry. 48 Fed.Reg. 57381.

On April 25, 1984, the ITA issued a Preliminary Determination finding that there was reasonable basis to believe or suspect that pads for woodwind instrument keys from Italy were being dumped, or sold at less than fair value. The ITA also found a "weighted-average margin," that is, a percentage by which the foreign market value of the merchandise exceeded the price of United States sale for Pisoni. 49 Fed.Reg. 17791. On July 11, 1984, the ITA issued its Final Determination that woodwind key pads from Italy were being sold at less than fair value. 49 Fed.Reg. 28295. In August, the ITC issued its Final Determination that a U.S. industry was being materially injured. 49 Fed.Reg. 34313. On September 21, 1984, the ITA issued an Antidumping Duty Order, finding sales that took place at a weighted-average margin of approximately 1% for both Pisoni and Pads Manufacture. 49 Fed.Reg. 37137.

The Court of International Trade reversed this decision. *Luciano Pisoni*, 10 C.I.T. 424, 640 F.Supp. 255 (1986). In its appeal, Pisoni made two arguments in favor of reversal that are relevant here. The first was that certain inaccuracies and misrepresentations in the petition meant that the ITA should have terminated the proceeding and investigation as soon as the inaccuracies were discovered. Plaintiff alleged that the discovery of the mislabelling of the price list effective from 1976–1980 as being effective January 1, 1982 (leading to the initial use of an unjustifiably low U.S. market price, and thus a higher weighted average margin) and the incorrect

denomination of the prices in dollars and lira meant that the entire investigation should have been terminated. The Court of International Trade rejected this argument, stating that, although the price lists were "suspect," the decision to continue was reasonable, because the ITA must make its investigation on the best evidence available, and must verify all data, and that "corrections to petitioner's data are the very point of verification procedures." 640 F.Supp. at 258. The Court of International Trade concluded that it was not incumbent on the ITA to discontinue a proceeding, even if it found information in the petition to be inaccurate, if it still found evidence of sales at less than fair value. *Id.*

The Court of International Trade found, however, that the use of certain quarterly exchange rates by ITA, instead of exchange rates prevailing at the time of the sales transactions at issue, had been improper. Accordingly, the administrative findings with respect to Pisoni were remanded to the ITA for recalculation. On remand, the ITA found that keypads manufactured by Pisoni were not being sold at less than fair value, although there was a *de minimis* weighted-average dumping margin of .286%. 51 Fed. Reg. 40239 (November 5, 1986). The Court of International Trade had affirmed the decision on September 15, 1986, and effective November 5, the antidumping order was revoked as to Pisoni. That order remained in effect as to Pads Manufacture.

Having prevailed in the Court of International Trade and on remand, plaintiffs proceeded to seek attorney's fees from Commerce under the Equal Access to Justice Act, arguing that Commerce's actions were not substantially justified, and that Commerce had persisted in pressing tenuous factual and legal claims. Both the Court of International Trade, *Luciano Pisoni Fabbrica Accessori Instrumenti Musicali v. United States*, 11 C.I.T. 280, 658 F.Supp. 902 (1987), and the Federal Circuit, 837 F.2d 465 (Fed.Cir.1988), *cert. denied*, 488 U.S. 819, 109 S.Ct. 60, 102 L.Ed.2d 38 (1988), rejected this argument. The Court of Appeals for the Federal Circuit specifically found that the initial decision of the ITA to use the quarterly exchange rates,

while not found to be correct, was "carefully considered" and that Commerce had provided "reasonable explanations for its approach" to this "evolving area of the antidumping laws," and therefore could not provide the basis for an award of fees. 837 F.2d at 469.

 On any meaningful examination, as set against these undisputed facts relating to the Commerce proceedings, the allegations of the complaint cannot provide support for a cause of action based on the 1983 petition. To begin with, there is a substantial question here as to whether plaintiffs antitrust claims based on the 1983 proceeding must be barred by the statute of limitations. Under the Sherman and Clayton Acts, the applicable statute of limitations is four years. 15 U.S.C.A. § 15b (Supp.1994). A cause of action accrues "when a defendant commits an act that injures a plaintiff's business." *Zenith Radio Corp. v. Hazeltine Research, Inc.*, 401 U.S. 321, 338, 91 S.Ct. 795, 806, 28 L.Ed.2d 77 (1971). Because the litigation on which this portion of plaintiffs' claim is based ended, at the latest, in 1986, the plaintiffs' claim based on injuries caused by the sham litigation occurring before 1990 are barred. *See Higgins v. New York Stock Exchange, Inc.*, 942 F.2d 829, 832 (2d Cir.1991).[2]

Moreover, even if this portion of the claim was not barred by the statute of limitations, there are insufficient grounds here to support a finding that the actions before Commerce were objectively baseless. The *de minimis* finding of dumping in the 1983 proceeding indicates that sales at LTFV were taking place, and suggests that although the dumping at issue was not sufficient to merit the imposition of a countervailing duty, the question was a close one. Moreover, as set out above, the initial imposition of the antidumping penalty (and the finding of dumping that was sufficient to merit adverse action on the part of the ITC) was overturned on a

point of law that in the eyes of the Federal Circuit was by no means clear-cut. That is, even fully crediting plaintiffs' allegations that the initial petitions contained false statements relating to plaintiffs' pricing and applicable exchange rates, there was a basis for concluding the petition had merit. Under these circumstances, it would not be possible to find that the petitions were objectively baseless. *See Whelan v. Abell*, 827 F.Supp. 801 (D.D.C.1993) (where finding in previous administrative proceeding was equivocal, antitrust claim based on sham litigation would not lie).

 Plaintiffs also allege, however, that the findings in the 1983 antidumping proceeding were obtained by means of a fraud on Commerce, that is, a misrepresentation with respect to PMI's standing to file the 1983 petition. As best gathered from the papers and full record in this action, plaintiffs contend that misrepresentations made in the 1983 petition with respect to (1) defendants' status as a domestic industry or the location of its production; and, (2), the denomination of pricing and actual pricing of plaintiffs' products and the correct monetary conversion rate from dollar to lira and visa versa, acted as a fraud on the agency and unfairly subjected plaintiffs to the trouble and expense of participation in the various proceedings before the administrative tribunals. *See* Plaintiffs' Opposition to the Motion to Dismiss ("Plaintiffs' Opposition") at 28–29.

As a complaint alleging fraud on Commerce with respect to the 1983 petition, however, the present pleadings are inadequate. Plaintiffs decline to specifically identify the false statements at issue, instead referring to certain false statements in the pleadings as "materially incorrect and false price lists, newspaper articles and other data." Complaint ¶ 20. These pleadings thus do not specify what representations were made, or

---

**2.** It is proper to consider the alleged damages associated with the 1983 petition separately from those associated with the later proceedings. "In the context of a continuing [violation] of the antitrust laws ... this has usually been understood to mean that each time a plaintiff is injured by an act of the defendants a cause of action accrues to him to recover the damages caused by that act and that, as to those damages, the statute

of limitations runs from the commission of the act." *Zenith*, 401 U.S. at 338, 91 S.Ct. at 806. Moreover, to the extent plaintiffs would argue that a claim of fraudulent concealment with respect to PMI's status as a domestic producer should toll the statute of limitations, as discussed in text, plaintiff has not stated a colorable claim of fraud.

how such representations were untruthful or improper. As a result, they fail to state a cause of action for fraud sufficient to support a claim of "sham" litigation based on fraud upon the preceding tribunal. *See Michael Anthony Jewelers, Inc. v. Peacock Jewelry, Inc.*, 795 F.Supp. 639, 649 (S.D.N.Y.1992) (in order to overcome presumption of *Noerr* immunity on basis of claim of fraud on prior tribunal, antitrust plaintiff must meet requirements of Rule 9(b) and plead fraud with particularity). *Cf. Great Lakes Mink Ass'n v. Furrari, Inc.*, 1987 WL 33592 (S.D.N.Y.) (claim of fraud on governmental agency must be plead with particularity).

■ Even viewing the allegations under Rule 12(b)(6), without the strictures of Rule 9(b), and supplemented by the assertions made by counsel for plaintiffs in its memoranda and at oral argument, plaintiffs' claims relating to the status of PMI as a domestic industry and the pricing alleged in the petitions are insufficient to state a cause of action for fraud in connection with the 1983 proceedings. The determination of whether a petitioner before Commerce may be viewed as a domestic producer is a complex issue of law and fact that must be resolved on a case-by-case basis. As explained by the ITC in the Preliminary Determination in the 1992 proceeding at issue here:

> In determining whether a firm qualifies as a domestic producer, the Commission examines such facts as: (1) the extent and source of a firm's capital investment; (2) the technical expertise involved in the U.S. production activity; (3) the value added to the product in the United States; (4) employment levels; and (5) any other costs and activities in the United States directly leading to production of the like product, including where production decisions are made. No single factor is determinative and value added information is more meaningful when other indicia of production activity are taken into account. The Commission may consider other factors deemed relevant in light of the particular investigation.

Pads for Woodwind Instrument Keys from Italy, Investigation No. 731–TA–627, USITC Pub. No. 2583 at 8, n. 20. Thus, in the absence of a prior adjudication of the issue, the ultimate disposition of this issue by Commerce would be difficult to predict. *See Liberty Lake Investments, Inc. v. Magnuson*, 12 F.3d 155 (9th Cir.1993) (where issue determined in prior proceeding was matter of degree, antitrust claim based on sham litigation was inappropriate), *cert. denied*, —— U.S. ——, 115 S.Ct. 77, 130 L.Ed.2d 32 (1994).

In any event, during the proceedings on the 1983 petition, the issue of PMI's status as a domestic producer was raised and resolved favorably to petitioner (the defendant here). USITC Pub. 2583 at 8, n. 22 (citing USITC Pub 1566 at 4). Moreover, as set out in more detail below, the final determination in the 1992 proceeding holds that, even considering the additional allegations regarding defendants' Mexican manufacturing facilities prior to 1991, defendants qualified as domestic producers with standing to commence ITC proceedings.

■ Nor does the question of whether the correct conversion rate was employed in determining the pricing of the plaintiffs' products provide a basis for a claim of an action for fraud on the agencies or "sham litigation." As established by the record in this case, the agency, not the petitioner, ultimately determined the exchange rate employed in the price calculation. *See* 49 Fed.Reg. 28295. And, as described above, this issue was the subject of a previous proceeding in which plaintiffs here sought the costs of defending the Commerce proceedings from the government. There, the Court of Appeals for the Federal Circuit held that the issue of the correct conversion rate was sufficiently unclear as a matter of law as not to merit the award of costs. No coherent reason has been presented to allow a new proceeding based on these same allegations to go forward under another guise. Moreover, the presentation of plaintiff's—an importer's—prices in lira as opposed to dollars and visa versa hardly constitutes "fraud," since the filing of the petition itself would have alerted Commerce at that time to any problem with the denomination of pricing.

Similarly, the inaccurate labelling of price lists given to Commerce in the 1983 proceed-

ing does not and could not support a finding in the present circumstances that the claim was brought without a reasonable objective hope of success. In *Luciano Pisoni,* 640 F.Supp. 255 (CIT 1986), the initial appeal of the determination finding dumping, the Court of International Trade found that certain price lists had been submitted which were mislabelled as to date by the petitioners and that those lists were "suspect." *Id.* The mislabelling of the price lists, however, is apparently not the basis of plaintiffs' claim here. Moreover, even if such a claim were presented in the present action, it appears that Commerce, aware of the misrepresentations, and acting independently of the defendants, found sufficient substance to the petition to continue the investigation, and thus found that the mislabelling did not render the petition meritless. Accordingly, defendants are entitled to *Noerr* immunity with respect to the 1983 filings.

### The 1991 Administrative Review

■ An interested party may request that Commerce conduct an annual administrative review of an antidumping order. 19 C.F.R § 353.22 (1993). After receipt of a timely request, or on its own initiative, the ITA will publish a notice of initiation and send out questionnaires to interested parties requesting factual information for the review.

On September 5, 1991 Commerce issued a notice of intent to revoke the previous antidumping order entered with respect to Pads Manufacture as result of the original 1983 proceeding. 56 Fed.Reg. 43906.[3] PMI, acting *pro se,* objected to the revocation, and on October 18, 1991, Commerce initiated an administrative review based on the 1984 order pertaining only to Pads Manufacture. 56 Fed.Reg. 52254. No review was initiated against Pisoni.

Luciano Pisoni, the principal of Pisoni, deposes that he was "forced to defend" against an improper administrative review in 1991. Affidavit of Luciano Pisoni, attached as Ex-

hibit 1 to Plaintiffs Opposition, ¶ 17. However, the uncontroverted administrative record of the proceedings before Commerce indicates that no administrative review with respect to Pisoni took place in 1991. Thus, at best, Mr. Pisoni's assertion reflects that defendant may have sought to have an administrative review take place with respect to Pisoni, but that no such review was ever brought underway.

Accordingly, a claim of sham litigation based on defendants' conduct in connection with the 1991 administrative review also appears to be unavailable on the present facts. Counsel's appearance in the 1991 administrative proceeding hardly gives rise to a claim of sham proceedings—a viable administrative review still existed with respect to defendants' co-defendant in the earlier proceeding, Pads Manufacture. Moreover, the record is uncontroverted that the administrative review undertaken in 1991 did not pertain to plaintiffs. It is therefore difficult to discern how defendants' conduct in association with the administrative review could constitute "sham litigation."

### The 1992 Petition

■ In October 1992, PMI again filed petitions with Commerce alleging that the woodwind key pads manufactured in Italy were being, or were likely to be, sold in the United States at less than fair value, and that the imports were materially injuring or threatening material injury to a United States industry. On November 17, 1992, the ITA found that the petition filed by PMI was sufficient to initiate an investigation. 57 Fed.Reg. 54229. On December 8, 1992 the ITC also made a Preliminary Determination that there was a reasonable indication that an industry in the United States was materially injured by reasons of imports of pads for woodwind instrument keys from Italy. 57 Fed.Reg. 59843. The ITC also issued a supplemental opinion explaining its reasons for the Preliminary Determination. *Pads for Woodwind Instrument Keys from Italy,* In-

---

**3.** On July 9, 1986 and September 8, 1986, before the revocation of the initial antidumping order as to Pisoni in November 1986, the Commerce Department initiated an administrative review of the September 21, 1984 administrative duty order. Counsel for Prestini also appeared in con-

nection with that review. That proceeding was terminated as to Pisoni when the initial antidumping order was revoked. 51 Fed.Reg. 13265. The review continued as to Pads Manufacture, the party against whom an antidumping order had been entered and upheld on appeal.

vestigation No. 731–TA–627, USITC Pub. No. 2583 (December 1992). On May 25, 1993, Commerce issued its Preliminary Determination, and found sales at less than fair value, or LTFV, with a weighted average margin for Pisoni of 1.26%. 58 Fed.Reg. 30015.

On September 23, 1993, the ITC issued its final determination which, despite the initial finding of sales at LTFV, found that an industry in the United States was not being materially injured or threatened with material injury by reason of the imports from Italy of keypads for woodwinds. *Pads for Woodwind Instruments Keys from Italy*, Investigation No. 731–TA–627. Specifically, the ITC determined that woodwind pads from Italy were "like product" with respect to the U.S. manufacturer's product, as required for the entry of an antidumping order. In addition, the ITC found that the petitioner was a "domestic producer" for the purposes of bringing the proceedings, despite its earlier extensive assembly operations in Mexico. The agency determined that the petitioner's Mexican operations ceased in 1991, and noted that, even before that time, the nature of the assembly operation was such that the equipment used in Mexico was neither extensive nor expensive, that capital investment in Mexico was not as sizable as in the United States, and the value added to the product there was not as substantial as that added in the United States. *Id.* at 9–10. Finally, the ITC found that "the technical expertise required to perform the assembly in Mexico was minimal. Therefore we do not exclude petitioner from the domestic industry." *Id.*[4]

The ITC also found, however, that the two products were not close substitutes for one another, because most purchasers of the Italian product still would have purchased the imports because of quality differences and other non-price factors, even if they had been fairly traded, and accordingly the effect of LTFV imports on the domestic product, if there was any, was minimal. *Id.* at 19. The ITC determined that, while there had been increased market penetration by the imports, there was no indication that the penetration would increase to an injurious level because of the lack of significant excess foreign capacity and the limited substitutability of the products. *Id.* at 22–23. One of the Commissioners dissented and found that the LTFV imports were causing injury to the domestic industry. *Id.* at 35–47. Defendants here appealed the negative determination of the ITC on October 29, 1993. The appeal was recently withdrawn by PMI with prejudice.

The 1992 petition cannot be viewed as "objectively baseless." The proceedings on that petition established that plaintiff had, in fact, been selling keypads at LTFV, and by a greater margin than in the 1983 proceedings. The basis for the conclusion that petitioner was not entitled to relief was thus not the same as that advanced for the denial of such relief in 1983 (when the ITC found the dumping margin insufficient to merit relief). Moreover, in the dissent from the final determination in 1993, one of the Commissioners took the position that dumping materially injuring a domestic industry was indeed taking place. At a minimum, this dissent demonstrates that there was substantial ground for disagreement as to the ultimate determination in that proceeding. *See PRE*, —— U.S. at ——, 113 S.Ct. at 1930 (where rule of Ninth Circuit, in which case had been brought, would not permit plaintiff's claim as matter of law, Court held claim could nonetheless not be viewed as "sham" because it was based on an objectively "good faith argument for the extension, modification or reversal of existing law," and thus met the requirements of Rule 11, since Ninth Circuit rule had been criticized by some commentators and courts).

■ The possibility does exist, however remote, that the institution of two unsuccessful antidumping proceedings nine years apart was intended solely to injure plaintiffs competitively in a trade war that defendants appear to be losing, and not to secure the

---

4. At the level of the preliminary determination, the ITC criticized PMI for not segregating its information relating to the Mexican operations, and noted that the inability to separate the data was a basis for the continuation of the proceed- ing. However, in view of the ultimate finding that PMI was domestic producer, it appears that this failing on the part of PMI was not material to the outcome of the proceeding.

555

trade relief for which such petitions were created by Congress. Even if such a malevolent intent could be shown, plaintiffs cannot sustain their burden of proving that defendants could not have reasonably expected success on the merits. As explained by the Supreme Court in *PRE*:

> Whether applying *Noerr* as an antitrust doctrine or invoking it in other contexts, we have repeatedly reaffirmed that evidence of anti-competitive intent or purpose alone cannot transform otherwise legitimate activity into a sham ... the legitimacy of objectively reasonable petitioning "directed toward obtaining governmental action" is "not at all affected by any anticompetitive purpose [the actor] may have had."

—— U.S. at ——, 113 S.Ct. at 1927 (citations omitted).

■ Although, as set out above, plaintiffs's sham litigation claims are not actionable, plaintiffs might still might have stated a federal antitrust cause of action based on the alleged theft of trade secrets and alleged attempt to price fix, provided a cognizable antitrust injury had been plead. *See* Amended Complaint ¶¶ 28, 30, 38. However, no antitrust injury has been plead here because plaintiffs have alleged no injury to competition itself based on defendants' claimed use of plaintiffs' trade secrets to compete with plaintiffs and its attempt to fix prices. Rather, as set out above, plaintiffs have plead only that they were injured by defendants' actions. *Brunswick Corp. v. Pueblo Bowl-O-Mat, Inc.*, 429 U.S. 477, 488, 97 S.Ct. 690, 697, 50 L.Ed.2d 701 (1977) (no antitrust injury existed where defendant's alleged actions did not hamper competition between plaintiff and defendant and harm consumers because of damage to competition); *Balaklaw v. Lovell*, 14 F.3d 793, 797 (2d Cir.1994) (same).

The remaining issues presented are whether the plaintiffs' allegations may state a common-law cause of action, and whether the factual allegations of intent and an attempt to price-fix, and of theft of trade secrets, may still state either an antitrust cause of action under state law or a claim of theft of trade secrets.[5]

### Common–Law Claims

Based on the same factual allegations as the antitrust cause of action, plaintiffs allege common-law claims for abuse of process, prima facie tort and wrongful institution of civil proceedings, as well as for violations of the Donnelly Act, the New York antitrust statute.[6] These claims, however, fail for many of the same reasons as they do when fashioned as federal antitrust claims.

■ First, as the parties agree, the Donnelly Act is modelled on and governed by the same standards as the federal antitrust laws. *State of New York v. Mobil Oil Corp.*, 38 N.Y.2d 460, 463, 381 N.Y.S.2d 426, 428, 344 N.E.2d 357, 359 (1976). Plaintiffs have suggested no reason why or how the policies underlying the Donnelly Act would be ill-served by the application of *Noerr* immunity to these claims. Accordingly, *Noerr* must apply in much the same manner to immunize claims based on non-sham litigation. *Suburban Restoration Co., Inc. v. Acmat Corp.*, 700 F.2d 98, 101–02 (2d Cir.1983) (holding Connecticut state-law unfair trade practices claim to be subject to *Noerr* immunity because Connecticut statute was coextensive with federal statute subject to *Noerr*).

Defendants also argue that other state common-law claims based on the filings before the Department of Commerce, abuse of process, prima facie tort, and wrongful institution of civil proceedings each require a

---

5. Because, even in the absence of the federal question jurisdiction conveyed by an antitrust claim, complete diversity exists between the parties, this analysis proceeds to consider the sufficiency of the common-law claims. *See* Amended Complaint ¶ 4 (alleging diversity as alternative source of jurisdiction).

6. The issue arises at this point as to what extent *Noerr* immunity extends to common-law or statutory claims based on the same factual allegations as the federal antitrust claims. The Second Cir-

cuit, while declining to rule on this issue, has suggested that the First Amendment underpinnings of *Noerr* mean that *Noerr* immunity should extend to causes of action, including state statutory unfair competition and common-law claims, other than federal antitrust claims. *See Suburban Restoration*, 700 F.2d 98, 101. In view of the analysis that bars these claims for other reasons, however, it is unnecessary to reach this issue.

showing of "probable cause," defined as objective baselessness, like that discussed in *PRE*,[7] and that the claims are, in any event, time-barred. Plaintiffs point out that the concept of excuse or justification in civil proceedings is not congruent to that of probable cause, that the causes of action alleged are more distinct in their requirements than defendants would have it, and that either late discovery of the facts underlying the causes of action or construction of those facts as a continuing wrong would toll the statute of limitations.

▮ · Plaintiffs arguments cannot salvage these causes of action. To begin with, plaintiffs' claim for wrongful institution of civil proceedings, which refers exclusively to the 1992 petition, (a tort otherwise known as malicious prosecution), cannot survive a motion to dismiss because that tort *does* incorporate a concept of probable cause, defined as "objective baselessness," like that invoked by the Supreme Court in *PRE*. *See Realty by Frank Kay, Inc. v. Majestic Farms Supply, Ltd.*, 160 A.D.2d 789, 553 N.Y.S.2d 858, 859 (2d Dep't 1990). Accordingly, this claim must be dismissed for the same reasons as plaintiffs' "sham litigation" antitrust claims.

▮ Similarly, defendants take the position that the claim for abuse of process based on the institution of the administrative review in 1991 must be dismissed because it incorporates a concept of "excuse or justification" equivalent to "probable cause" with respect to the tort of wrongful institution of civil proceedings. Probable cause, however, as pointed out by plaintiffs, is *not* an element of the tort of abuse of process. *See Weiss v. Hunna*, 312 F.2d 711 (2d Cir.1963). Rather, a claim of abuse of process may be brought where a plaintiff has alleged that:

(1) process has issued mandating that a party either perform or forbear from a prescribed act;

(2) such process was issued with an intent to do harm without excuse or justification; and

(3) the process is being used to obtain a collateral objective.

*Curiano v. Suozzi*, 63 N.Y.2d 113, 480 N.Y.S.2d 466, 468, 469 N.E.2d 1324, 1326 (1984).

▮ Here, the fatal flaw in plaintiffs' cause of action is that no process has issued, as that term is construed by the governing case law in the New York and federal courts. It is well established that the mere institution of an action by service of a complaint does not provide the basis for a claim of abuse of process, and that the act of defending the action is not performing or forbearing from a prescribed act. *PSI Metals v. Fireman's Ins. Co of Newark, N.J.*, 839 F.2d 42, 43 (2d Cir.1988) (claim that defendants improperly instituted suit to cause plaintiffs to expend time, money and effort in litigating suit failed to state claim under either New York or Massachusetts law of abuse of process).[8]

"Process," as understood by the New York courts, involves a direct interference with a party's person or property accomplished by means of legal process, which causes damage. *Curiano*, 480 N.Y.S.2d at 468, 469 N.E.2d at 1326. Because no review was ever undertaken with respect to defendants in 1991, there is no indication that any process interfering with plaintiff, or for that matter any process at all, was served. Plaintiffs' claim that the mere filing of a petition for administrative review in 1991 with Commerce constituted "abuse of process" does not provide adequate grounds for that tort.

---

7. Specifically, as discussed in more detail below, a plaintiff alleging abuse of process must show an "intent to do harm without excuse." A claim for prima facie tort must allege that harm was inflicted intentionally without "excuse or justification." A claimant for wrongful institution of civil proceedings must show that there was no "probable cause," or reasonable objective belief that the proceeding could terminate successfully, at the commencement of the civil action.

8. Moreover, *PSI Metals* expressly abrogated the holding of *Alexander v. Unification Church of America*, 634 F.2d 673 (2d Cir.1980), on which plaintiffs seek to rely on this issue. 839 F.2d at 43. The reasoning of *Avigliano v. Sumitomo shoji America, Inc.*, 473 F.Supp. 506, 515 (S.D.N.Y.1979) would therefore also appear to no longer reflect the applicable law.

The prima facie tort claim, for which plaintiffs also seek to bring a claim, has four elements:

(1) The intentional infliction of harm;

(2) causing special damages;

(3) without excuse;

(4) by an act or series of acts that would otherwise be lawful.

*Curiano,* 480 N.Y.S.2d at 469, 469 N.E.2d at 1327. Where prima facie tort is alleged because the plaintiff cannot meet the requirements of another tort, such as abuse of process or malicious prosecution, the claim cannot be permitted to stand. *Id.,* 480 N.Y.S.2d at 470, 469 N.E.2d at 1328. *See also, e.g., National Nutritional Foods Ass'n v. Whelan,* 492 F.Supp. 374, 384 (S.D.N.Y.1980) ("where the conduct alleged is implicitly or explicitly permitted by traditional doctrine, the catch-all prima facie tort has no useful service to perform. If the conduct is to be proscribed, the straight-forward way to do it is to revise traditional doctrine to punish what has gone unpunished"). Under this standard, it is well-established that retaliatory lawsuits claiming meritless litigation are not permitted based on a claim of prima facie tort. *Curiano,* 480 N.Y.S.2d at 470, 469 N.E.2d at 1328. In the present case the gravamen of plaintiffs' claim sounds in malicious prosecution, a claim that cannot lie because, *inter alia,* there existed probable cause for the petition.

Plaintiffs argue, however, that their claims for prima facie tort are factually distinguishable from their claim for abuse of process and malicious prosecution, incorporating as part of the allegations actions unrelated to the petitions before the Commerce Department, namely, claims that defendant Giuseppe Prestini attempted to get the plaintiff to agree to a price-fixing arrangement and stole its trade secrets. However, these allegations do not sufficiently distinguish the prima facie tort claim from the malicious prosecution or abuse of process claims.

The sine qua non of prima facie tort is the allegation of special damages caused by plaintiffs' disinterested malevolence. *Curiano,* 480 N.Y.S.2d at 470, 469 N.E.2d at 1328. In the present case, the special damages claimed by plaintiffs are all attributable to the alleged abuse of process or malicious prosecution: legal fees, the resulting lost profits and lost sales caused by the raise in prices eventuated by the legal fees (and, of course, the unsuccessful attempt to price fix is not alleged to have caused any damages at all). Moreover, the allegation of "competitive damages" with respect to the claim of theft of trade secrets in connection with the alleged violation of the Administrative Protective Order ("APO") entered in connection with the 1992 proceedings (Amended Complaint ¶ 28) and defendants' alleged use of plaintiffs' "confidential information," does not change this analysis, because these alleged losses of business to PMI were occasioned by the alleged theft of trade secrets, and relate to that cause of action. The prima facie tort claim is therefore surplusage, and must also be dismissed. *See, e.g., Cuillo v. Shupnick,* 815 F.Supp 133, 135–6 (S.D.N.Y.1993) ("[s]ince the harms which the [p]laintiffs complain of are fully covered by their other causes of action, no adequate claim of prima facie tort may be alleged here").

### Theft of Trade Secrets

Defendants move for summary judgment on plaintiffs' claim of theft of trade secrets. As best as it can be distilled from the papers here, plaintiffs allege two instances of submission of Pisoni's trade secrets by PMI in connection with the antidumping proceedings. Plaintiffs claim these submissions demonstrate that counsel for defendants breached the APO entered in connection with the 1992 Commerce proceedings by improperly giving access to confidential materials to their clients in violation of the protective order, and, in so doing, misappropriated plaintiffs' trade secrets.[9]

Specifically, plaintiffs claim that defendants, through their counsel, misappropriated certain tax return information relating to the percentage of defendants' revenue repre-

---

**9.** Unless otherwise protected by means of an APO the information maintained by Commerce in connection with the petitions before the ITC and ITA is publicly available. 19 C.F.R. § 207.4 (1993).

sented by sales of pads, information that could only have been obtained through the misappropriation, and which later surfaced in the testimony of Giuseppe Prestini. Plaintiffs claim that this information had been submitted by plaintiffs in confidence to Commerce in response to a confidential questionnaire on March 4, 1993. The objected-to statement, allegedly showing that Mr. Prestini had seen the information, was made by Mr. Prestini in a hearing before the ITC on August 12, 1993. *See* Plaintiffs' Opposition at 60–61. Although it is not entirely clear from the record, Mr. Prestini also seems to state at that time that the information had been submitted by Prestini (not Pisoni) to Commerce as part of the preliminary investigation.

In addition, plaintiffs claim that defendants misappropriated information relating to Japanese keypad customers and customer requirements set out in the confidential letter submitted to the DOC on April 6, 1993, the response to which was submitted by Prestini on April 22, 1993. It is plaintiffs' contention that paragraph (b) of the affidavit of Giuseppe Prestini, attached to Prestini's April 22 letter submission, contained confidential information taken from the confidential version of plaintiffs' April 6 letter in violation of the APO. Plaintiffs' Opposition at 61–63; Amended Complaint at ¶¶ 49–51. After skirmishes with Commerce and the Federal Circuit, Commerce determined that there was no reasonable cause to believe that the APO had been violated. *See* Attachments to Letter from Thomas R. Cox to the Court dated April 6, 1994.

More broadly, however, beyond the specific claimed violations of the APO raised in connection with the Commerce filings, plaintiffs also claim in present proceedings that, through counsel's breach of the APO, Prestini obtained access to plaintiffs' trade secrets, and in so doing, damaged plaintiffs. As set out in the pleadings, and supplemented by plaintiffs papers on this motion (which raise some factual allegations not detailed in the Amended Complaint), the trade secrets at issue include, on information and belief, "supplier lists, customer lists, [and] fabrication techniques." Amended Complaint ¶¶ 45–53.

Plaintiffs allege that the misappropriation, particularly of customer and sales lists, caused plaintiffs "substantial competitive harm." *Id.* ¶ 28.

■ To establish a claim for misappropriation of trade secrets a party must allege "(i) that it possessed a trade secret and (ii) that the defendant used that trade secret in breach of an agreement, a confidential relationship, or duty, or as a result of discovery by improper means." *Hudson Hotels Corp. v. Choice Hotels Internat.*, 995 F.2d 1173, 1175 (2d Cir.1993).

■ Factors to be considered in determining whether a plaintiff possesses a trade secret include:

(1) the extent to which the information is known outside of his business; (2) the extent to which it is known by employees and others involved in his business; (3) the extent of measures taken by him to guard the secrecy of the information; (4) the value of the information to him and to his competitors; (5) the amount of effort or money expended by him in developing the information; [and] (6) the ease or difficulty with which the information could be properly acquired or duplicated by others.

*Hudson Hotels,* 995 F.2d at 1176, n. 1. Under this standard, it has generally been held that the identity of wholesale customers and their requirements, unlike secret processes, or customer lists that are *not* available publicly, are not trade secrets, because that information is generally available in the trade to those who seek it. *See Gillespie & Co. of New York v. Weyerhaeuser Co.*, 533 F.2d 51 (2d Cir.1976) (list of wholesale customers of milk carton manufacturer was not trade secret). *See also Copy–Data Systems, Inc. v. Toshiba America, Inc.*, 755 F.2d 293, 302 (2d Cir.) (possession of list of wholesale customers advertising under defendants' name was not breach of implied covenant not to use confidential information), *cert. denied,* 474 U.S. 825, 106 S.Ct. 80, 88 L.Ed.2d 66 (1985); *Town & Country House & Home Service, Inc. v. Newbery*, 3 N.Y.2d 554, 558, 170 N.Y.S.2d 328, 331, 147 N.E.2d 724, 725 (1958) (no trade secret exists in names of customers openly engaged in business in advertised lo-

cations). *See generally* Roger M. Milgrim, *Trade Secrets* § 1.09[7][b][i], at 1–413 (1993).

Defendants contend that, as a matter of law, the information at issue did not constitute "trade secrets," because that information was known to the defendants through other sources. In support of this contention, defendants offer the affidavit of PMI's principal, as well as of its attorneys, stating that no trade secrets were ever supplied by the attorneys to PMI, and that the APO was not breached. By affidavit of Mr. Pisoni, however, plaintiffs contradict this assertion, and state that the information at issue was proprietary to them and unavailable elsewhere.

■ Had defendants submitted some uncontradicted evidence other than their own word that the information at issue was indeed available from public sources at the time of the claimed disclosures, for example, copies of the public Italian tax reports or an affidavit listing Japanese wholesale manufacturers and detailing defendants' contacts with those manufacturers, there would be a question here whether judgment ought to be entered in favor of defendants.[10] However, no such materials have been supplied on this motion. Thus, although, on the present record, plaintiffs claim of misappropriation of trade secrets appears tenuous, summary judgment is premature on this ground.

■ Defendants also argue that a review of the uncontested facts with respect to the Pisoni tax return information, to which defendants were alleged to have had access through their counsel, reveals that plaintiffs' allegations do not provide a basis for a claim of misappropriation of trade secrets. Defendants assert that there is no evidence that "discovery by improper means" took place with respect to the materials at issue because the record indicates that the testimony and information to which plaintiffs refer was submitted to Commerce not by Pisoni, but, rather, by Prestini as part of its initial petition. Defendants further explain that this testimony refers to an Italian tax report, and *not* to Pisoni's tax returns.[11]

This argument, however, is unavailing. While plaintiffs' claims could kindly be described as thin, and defendants' factual assertions may prove accurate, plaintiffs do dispute defendants' assertions, and have had no opportunity for factual discovery on these issues. Moreover, defendants have not provided copies of those original submissions, or their source, in support of their position. Accordingly, this issue cannot be resolved on this motion for summary judgment.

■ Defendants further contend that the resolution of the claim of breach of the APO before the Administrative Agency, which held that there was no reasonable cause to believe a breach had occurred, is entitled to preclusive effect, and bars plaintiffs' claim here. "When an administrative agency is acting in a judicial capacity and resolves disputed issues of fact properly before it which the parties have had an adequate opportunity to litigate, the courts have not hesi-

---

10. If there was no proof of any violation of the APO leading to disclosure of a trade secret to defendants, and no issue of the existence of any trade secret disclosed, there would be no issue of fact to be tried. Plaintiffs would not be entitled to a trial in order to call counsel as witnesses solely for the purpose of impeaching them, if that testimony was the only proof of plaintiffs' cause of action. Plaintiff's suspicions as to defendants' dishonesty cannot defeat summary judgment in the absence of other proof of the claim. *See United States v. Eisen*, 974 F.2d 246, 262 n. 6 (2d Cir.1992), *cert. denied,* —— U.S. ——, 113 S.Ct. 1840, 123 L.Ed.2d 467 (1993); *Martin v. Citibank*, 762 F.2d 212 (2d Cir.1985) (reversing jury verdict for plaintiff on ground that mere disbelief of only witness on subject, absent other proof, could not support judgment). *See also Dyer v. MacDougall*, 201 F.2d 265 (2d Cir.1952) (where there is other independent support in the evi-

dence, a jury may draw a negative inference from disbelief of a witness); 1 J. Weinstein & M. Berger, *Weinstein's Evidence* ¶ 401[05], at 401–32 n. 16.

11. Defendants also contend that the failure of plaintiffs to properly controvert with specific factual allegations the defendants' allegations in their local Rule 3(g) statement denying the breach of the APO, and the affidavits of counsel doing the same, entitles them to summary judgment. This argument, however, appears over-technical. Virtually all the 3(g) assertions on which defendants seek to rely refer to matters exclusively within the control and knowledge of defendants. Accordingly, the presence of a colorable claim that a tort has been committed renders the entry of summary judgment before discovery improper.

tated to apply res judicata to enforce repose." *United States v. Utah Const. & Min. Co.,* 384 U.S. 394, 422, 86 S.Ct. 1545, 1560, 16 L.Ed.2d 642 (1966).

Plaintiffs take the position that there can be no claim preclusion in the present case because of the determination by the U.S. Department of Commerce not to initiate full adversary proceedings on the claimed breach on a finding that there was no reasonable cause to believe the APO was violated, *see* 19 C.F.R. § 354.1 *et seq.,* did not allow it discovery or full adversary proceedings on the question of breach of the APO. *See* letter from Larry Klayman, Esq. to the Court dated April 14, 1994. On this point, plaintiffs appear substantially correct. *Astoria Federal Savings & Loan Ass'n v. Solimino,* 501 U.S. 104, 106, 111 S.Ct. 2166, 2169, 115 L.Ed.2d 96 (1991) (explaining that rationale behind administrative preclusion depends on participation in prior adversarial proceedings). *See also* 4 K. Davis, *Administrative Law* at 52 (2d Ed.1983) (preclusive effect of administrative determination depends on full and fair opportunity to litigate before administrative body).

Moreover, the claims here are broader than those presented to Commerce. Plaintiffs allege not only theft of the tax return and customer information, but also, on information and belief, theft and use of other (unspecified) trade secrets through the breach of the APO. Accordingly, summary judgment cannot be granted here because defendants have not made a showing that there is no evidence that there was a breach of the APO.

### Conclusion

Defendants' motion to dismiss Counts I, II, IV, V and VI of the Amended Complaint, which is treated as a motion for summary judgment pursuant to Rule 12(c) to the extent previously indicated, is granted; defendants' motion for summary judgment with respect to Count III is denied, with leave to renew after discovery confined to Count III of the Amended Complaint.

SO ORDERED.