**CHEMINOR DRUGS, LTD. and Reddy–Cheminor, Inc., Plaintiffs,**

**v.**

**ETHYL CORPORATION and John Does 1 through 10, Defendants.**

**No. Civ. 94–4371 JAG.**

United States District Court,
D. New Jersey.

Feb. 5, 1998.

Andrew J. Miller, Budd, Larner, Gross, Rosenberg, Greenberg & Sade, Short Hills, NJ, for Plaintiffs.

Douglas S. Eakeley, Timothy G. Hansen, Lowenstein, Sandler, Kohl, Fisher & Boylan, Roseland, NJ, for Defendants.

## OPINION

GREENAWAY, District Judge.

This matter comes before the Court on the motion for summary judgment of Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys for defendant Ethyl Corporation ("Ethyl").

## PRELIMINARY STATEMENT

Cheminor Drugs, Ltd. ("Cheminor") and its recently-formed subsidiary, Reddy–Cheminor, Inc. ("Reddy–Cheminor"), allege that Ethyl is liable under theories of antitrust, malicious prosecution, abuse of process, tortious interference and unfair competition. On July 31, 1991, Ethyl filed a petition (the "Petition")[1] with the Department of Commerce ("DOC") and the United States International Trade Commission ("USITC"), requesting the imposition of anti-dumping and countervailing duties ("AD/CVD") on imports of bulk ibuprofen from India. The Petition, which is at the heart of this litigation, alleges that from 1988 through 1991, the Government of India subsidized Cheminor, an Indian company[2], in excess of 76% of the export value of its bulk ibuprofen. Cheminor 12G ¶ 18.[3] The Petition also alleges that from 1988 through 1991 Cheminor dumped bulk ibuprofen into the U.S. market at less than fair value ("LTFV"). *Id.* at ¶ 19. Cheminor does not dispute either that it received subsidies or dumped ibuprofen in the U.S. market. Cheminor does assert, however, that Ethyl could not have prevailed on its Petition because it could not have proven that it was materially injured by the sale of the imported product. Cheminor also claims that Ethyl wrongfully filed and prosecuted a Petition, replete with intentional misrepresentations,[4] causing Cheminor to withdraw from the U.S. market and lose sales.

Ethyl filed the instant summary judgment motion and denied making any misrepresentations. Assuming *arguendo*, that Ethyl somehow misled the USITC about its financial condition, the issue presented, according to Ethyl, is whether plaintiffs can establish that the entire petitioning process was "objectively baseless". In short, Ethyl asserts that the record demonstrates that it had probable cause to file the Petition; as such, it is immune from antitrust liability pursuant to the First Amendment and the Noerr–Pennington doctrine. In the alternative. Ethyl claims that its legitimate petitioning of its government not only entitles it to First Amendment protection but also defeats each of plaintiffs' individual claims—i.e., malicious prosecution. abuse of process, tortious interference, unfair competition and violations of federal and state antitrust laws.

## FACTS

Ethyl manufactures numerous chemicals, including bulk ibuprofen. Ethyl began manufacturing this anti-inflammatory drug in 1978. Turnipseed Certif. ¶ 2.[5] In May 1984,

---

1. The Petition is attached as Exhibit A to the Certification of Will E. Leonard ("Leonard Certif."), submitted in support of Ethyl's motion.

2. Reddy–Cheminor is a New Jersey corporation and Ethyl is a Virginia corporation.

3. References in the form "Cheminor 12G at ¶ __" are to Cheminor's Statement of Undisputed Material Facts, submitted pursuant to then General Rule 12G, now amended Local Civil Rule 56.1.

4. Plaintiffs' Amended Complaint, entered on the docket on June 19, 1995, alleges malicious prosecution, abuse of process, tortious interference, unfair competition and state and federal antitrust claims. The Amended Complaint, however, does not include a specific cause of action for misrepresentation. *See* Hansen Certif. Ex. J (refer-

ences in the form Hansen Certif. are to the Certification of Timothy G. Hansen, submitted by defendants in support of this motion).

5. References in the form "Certif. ¶ __" are to the Certification of Max Turnipseed, former Director of International Trade and Regulatory Affairs for Albermarle Corporation, submitted by Ethyl in support of this motion. On February 28, 1994 Ethyl transferred the assets of its specialty chemical businesses, including the bulk ibuprofen business, to Albermarle and declared the stock of Albermarle Corporation as a dividend to Ethyl's shareholders. From August 1, 1991 through February 28, 1994, Turnipseed was the Director, International Trade and Regulatory Affairs, for Ethyl. Prior to that, Turnipseed held various positions at Ethyl and had been working there since November 1966.

the FDA gave ibuprofen manufacturers, Upjohn Co. ("Upjohn") and Boots Co. USA, Inc. ("Boots") [6], its approval for a two and one-half year period of marketing exclusivity to sell over-the-counter ("OTC") ibuprofen in 200 milligram dosages. *Id.* at ¶ 5. In September 1986, the period of exclusivity granted to Upjohn and Boots to market OTC ibuprofen expired and new ibuprofen products flooded the market. *Id.* As of June 1990, the FDA approved 27 companies to sell ibuprofen in one or another of several dosage forms. *Id.*[7]

In 1987, bulk ibuprofen manufactured in India began entering the U.S. market. In 1988, Cheminor received FDA approval to sell its bulk ibuprofen to tablet manufacturers in the U.S. From 1988 through 1991, Cheminor was the only Indian manufacturer, selling bulk ibuprofen to formulators in the U.S., that had secured appropriate FDA approval. Turnipseed Certif. ¶ 6.[8]

Ethyl contends that from the time Cheminor entered the U.S. market with commercial quantities of bulk ibuprofen in 1988, it experienced remarkable success in gaining both overall volume as well as market share. The success occurred primarily as a result of Cheminor's pricing strategy of selling bulk ibuprofen at LTFV. *Id.* at ¶ 12. Ethyl also contends that it learned that Cheminor had been benefitting from numerous subsidies front its own government. *Id.* at ¶ 16. Further, by 1991, Ethyl believed Cheminor was receiving subsidies from the Indian government in excess of 76% of the bulk ibuprofen's export value. *Id.* According to Ethyl, ¶ of the Cheminor went from importing 57,000 kilograms in 1988 to importing 200,000 kilograms in the first six months of 1991. *Id.* at ¶ 7. This growth represented an increase in

Cheminor's U.S. market share from 2.19% in 1988 to 11.19% for the first six months of 1991. *Id.* at ¶ 10.

In 1988, based on Ethyl's belief that Cheminor was receiving substantial subsidies and that its sales were LTFV, Ethyl filed a petition with the Chairman of the Generalized System of Preferences ("GSP") Subcommittee. Office of the U.S. Trade Representative, asking it to "withdraw GSP eligibility for duty-free treatment on ibuprofen imports from India." Turnipseed Certif. at Ex. C. Because bulk ibuprofen was on the list of eligible articles under the GSP program. Cheminor—unlike the foreign importers (and competitors) from the U.K., Japan and Spain—did not have to pay any duty on its export of bulk ibuprofen to the U.S. The President of the United States denied Ethyl's request.[9] *Id.* ¶ 21 and Ex. D. On May 19, 1989, Turnipseed received a letter from the Office of the United States Trade Representative ("USTR"), explaining that the USTR denied the Petition because "[i]mports from GSP countries comprise only two percent of the U.S. market. Consequently, the USITC determined that removing ibuprofen from India from the list of eligible articles under GSP would have little [effect.]" *Id.* However, imports from India continued to increase substantially during 1989–1990. Thus, in 1991, Ethyl filed a renewed request with the USITC asking that the U.S. withdraw ibuprofen imports from India from the GSP eligibility list. The USITC granted this request, effective July 1, 1991. *Id.* at 27.

The U.S. government's decision to remove bulk ibuprofen from India from GSP eligibility did not obviate Ethyl's concern that Cheminor would continue to use the Indian government's subsidization it was enjoying at

---

6. Upjohn was a licensee of Boots, the U.S. subsidiary of Boots P.L.C., a British company. Upjohn first introduced ibuprofen to the United States market as a prescription drug in 1974. Turnipseed Certif. ¶ 1.

7. The passage of the Drug Price Competition and Patent Term Restoration Act of 1984, known as the Waxman–Hatch Act, also aided the explosive growth in the domestic generic pharmaceutical industry. The Act omitted the requirement that generic pharmaceutical companies had to prove anew the safety and efficacy of a drug already

approved in a New Drug Application ("NDA"), filed originally by the inventor of the drug. Turnipseed Certif. ¶ 1.

8. Cheminor had an exclusive distribution agreement in the U.S. with Flavine International, pursuant to which Cheminor would supply all the bulk ibuprofen that Flavine could sell. Cheminor 12G at ¶ 1.

9. The Office of the U.S. Trade Representative is under the auspices of the Executive Office of the President. Turnipseed Certif. Ex. D.

home to dump bulk ibuprofen in the U.S. market. Ethyl Brief at 5[10]. On July 31, 1991, Ethyl filed an AD/CVD Petition with the DOC and the USITC[11]. Ethyl's Petition alleged that ibuprofen from India was being sold in the U.S. at LTFV margins of 34% to 39%, Petition at 9, and that Cheminor was benefitting from over thirteen separate subsidies from the Indian government, amounting to more than 76% of the total export value. *Id.* at 18–34. Ethyl also alleged that Cheminor's continued practice of dumping subsidized bulk ibuprofen into the U.S. "[h]as caused and is causing material injury to petitioner and threatens it with further injury." *Id.* at 34.

Upon the filing of the Petition, the DOC investigated whether bulk ibuprofen from India was sold in the U.S. at LTFV and whether it was subsidized by the Indian government. The USITC investigated whether Ethyl was materially injured. or threatened with material injury, as a result of the dumped and subsidized imports. Ethyl 12G ¶ 27.[12] As part of its investigation, the USITC asked Ethyl to complete a questionnaire. On August 13, 1991, Ethyl returned the completed questionnaire to the USITC. *Id.* ¶ 28. The USITC also sent questionnaires to Flavine and tablet manufacturers. *Id.* at ¶ 29.[13] The DOC issued questionnaires to Cheminor as part of its AD and CVD investigations. *Id.* at ¶¶ 32 & 35.

Cheminor claims that Ethyl knowingly misrepresented information to the USITC in its Petition and responses to the questionnaires. Specifically, Cheminor alleges that Ethyl intentionally: (1) failed to disclose a product recall that reduced its 1990 profits by at least $1.2 million. Cheminor 12G ¶ 105;

(2) reduced its first half-year 1991 profits by $2.7 million by including research and development and manufacturing costs for S + ibuprofen—as opposed to ibuprofen—a product which was not being imported from India in 1991 and therefore was not being investigated by the USITC. *Id.* at ¶¶ 88–93; and (3) reduced its first half-year 1991 profits by another $2.1 million by including future environmental and expansion costs. *Id.* at ¶¶ 74–87.

On September 16, 1991, the USITC issued its preliminary determination (the "USITC Report"), concluding that there was a reasonable indication that the ibuprofen industry in the U.S. had been materially injured by reason of bulk ibuprofen imports that the Government of India allegedly, subsidized these imports, and Cheminor sold the bulk ibuprofen imports in the U.S. at LTFV. Leonard Certif. ¶ 17.

The USITC Report cited two separate and distinct indications of material injury: (1) that Ethyl's "financial trends" demonstrated material injury; and (2) that "other factors, such as apparent domestic consumption and market share, further provide a reasonable indication of present injury." USITC Report at 16.[14] The USITC began its injury analysis by identifying the factors it would consider in making its injury determination. The factors employed included domestic consumption, production, capacity, capacity utilization, shipments, inventories, employment, financial performance, capital investment and research and development efforts. USITC Report at 15–16. In articulating the bases for its conclusion that Ethyl was being materially injured, the USITC used the same

---

**10.** "Ethyl Brief" refers to Ethyl's initial brief filed in support of this motion.

**11.** The filing of the Petition initiated dual proceedings whereby the DOC investigated whether Cheminor had been receiving subsidies and whether it had been dumping bulk ibuprofen into the U.S. market. The USITC investigated whether or not Ethyl was being harmed by, or was threatened with material injury as a result of, bulk ibuprofen from Cheminor. Leonard Certif. ¶ 4.

**12.** References in the form "Ethyl 12G at __" are to Ethyl's Statement of Undisputed Material

Facts, submitted pursuant to then General Rule 12G, now amended Local Civil Rule 56.1.

**13.** During oral argument, Mr. Miller, counsel for the plaintiffs, acknowledged that Cheminor and the Government of India also filled out questionnaires for the USITC. Tr. at 17 ("Tr. at __" refers to the transcript of proceedings before this Court on August 22, 1997).

**14.** The USITC Report, along with the Additional Comments of the Chairman and the information gathered during the preliminary investigation, are attached as Exhibit G to the Leonard Certification.

reasoning it had initially set forth in the Report. *Id.* at 16.[15]

Cheminor claimed that the USITC's preliminary determination had little significance because: (1) respondents had little or no input into the questionnaire the USITC used for its preliminary determination; and (2) the USITC had little or no time in its preliminary investigation to probe the accuracy of the information that the domestic industry submitted and must, in preliminary determinations, resolve all doubts in favor of the petitioner. Cheminor 12G ¶¶ 136–37.[16]

On August 26, 1991, the DOC announced its determination to initiate the AD and CVD investigations and issued its preliminary CVD questionnaire to Cheminor and the Government of India. Leonard Certif. ¶ 22. On December 13, 1991, the DOC made its preliminary CVD determination in favor of Ethyl, finding a subsidy in the amount of 43.71%. *Id.* at ¶ 24 & Ex.N. Along with this preliminary determination, the DOC directed the United States Customs Service to require a cash deposit or bond for all entries of this merchandise, equal to 43.71% *ad valorem*, for bulk ibuprofen produced and exported by Cheminor. *Id.*

In a letter dated January 13, 1992, Cheminor informed the DOC of its intention to withdraw from the U.S. bulk ibuprofen market and that because of the DOC's CVD determination "all outstanding orders and letters of credit for Cheminor's bulk ibuprofen were canceled by its exclusive U.S. importer, Flavine International, Inc." Leonard Certif. ¶ 25 & Ex. O. Cheminor also informed tile DOC that it would not participate

in either the AD or CVD verification. *Id.* at ¶ 25.[17]

On February 27, 1992, the DOC issued its preliminary determination that imports of ibuprofen from India were being sold in the U.S. at LTFV and that there was an estimated dumping margin of 115.94%. Leonard Certif. ¶ 26.

On March 4, 1992, Ethyl informed the DOC that it was withdrawing its Petition. *Id.* at ¶ 26. Ethyl claimed that Cheminor's announcement that it was withdrawing from the U.S. market undermined Ethyl's ability to allege that bulk ibuprofen from India posed a "threat of material injury to Ethyl." Turnipseed Certif. ¶ 44. In addition, Cheminor's decision also had the practical effect of granting Ethyl more relief than it had sought by filing the Petition.[18]

Cheminor claims that Ethyl's explanations for withdrawing its Petition are implausible. Cheminor alleges that "[w]hen Ethyl withdrew its petition, there was no assurance that Cheminor would not re-enter the United States market which assurance could have been obtained had Ethyl successfully, prosecuted its petition to a conclusion or had the Department of Commerce entered into a suspension agreement with Cheminor and/or the Indian government." Cheminor 12G ¶ 185. Cheminor claims that its announcement that it was leaving the bulk ibuprofen business could not, by itself, render moot the threat of material injury allegations in Ethyl's Petition. *Id.* at ¶ 187. Cheminor also points out that Ethyl withdrew its Petition because it believed, and was advised by counsel, that it

---

**15.** In addition, in the section of the USITC Report entitled "Additional Views of Acting Chairman Anne E. Brunsdale", Chairman Brunsdale bases her conclusion of material injury on the following three factors: (1) "the subject imports are quite substitutable" for domestic bulk ibuprofen. (2) "the alleged dumping and subsidy margins in these investigations are quite high" and (3) the share of U.S. bulk ibuprofen market accounted for by the Indian imports is not small enough to ensure that there is no material injury. USITC Report at 26–27.

**16.** According to Cheminor, in contrast to the preliminary USITC's determinations, where all doubts are resolved in favor of the petitioner, in connection with the final injury investigation, the

USITC commissioners resolve doubts in favor of the respondents concerning information petitioner supplied. Cheminor 12G ¶ 138.

**17.** A "verification" is when the DOC, in the exporting country, conducts an "onsite" inspection of all books and records to substantiate the questionnaire responses. Leonard Certif. ¶ 8.

**18.** The other reasons Ethyl gave in support of its decision to withdraw its Petition were: (1) that it experienced better than expected profits for the second half of 1991, due to increased sales and lower than expected environmental costs; and (2) the significant avoidance of legal fees which it would have incurred if it had prosecuted the Petition any further.

could not show material injury and would lose the USITC case.[19]

## DISCUSSION

Fed.R.Civ.P. 56(e) provides for summary judgment when the moving party demonstrates that there is no genuine issue as to a material fact and the evidence establishes the moving party's entitlement to judgment as a matter of law. *Celotex Corp. v. Catrett*, 477 U.S. 317, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986); *Orson, Inc. v. Miramax Film Corp.*, 79 F.3d 1358, 1366 (3d Cir.1996). In making this determination, the court must draw all reasonable inferences in favor of the nonmovant. *National State Bank v. Federal Reserve Bank of New York*, 979 F.2d 1579, 1581 (3d Cir.1992).

Once the moving party has satisfied its initial burden, the party opposing the motion must establish that a genuine issue as to a material fact exists. *Jersey Cent. Power & Light Co. v. Lacey Township*, 772 F.2d 1103, 1109 (3d Cir.1985). However, the party opposing the motion for summary judgment cannot rest on mere allegations and must instead present actual evidence that creates a genuine issue as to a material fact for trial. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 243, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *Siegel Transfer, Inc. v. Carrier Express, Inc.*, 54 F.3d 1125, 1130–31 (3d Cir. 1995); *Quiroga v. Hasbro, Inc.*, 934 F.2d 497, 500 (3d Cir.1991) (citing *Sound Ship Building Corp. v. Bethlehem Steel Co.*, 533 F.2d 96, 99 (3d Cir.1976)); *see also Schoch v. First*

*Fidelity Bancorporation*, 912 F.2d 654, 657 (3d Cir.1990) ("unsupported allegations in [a Plaintiff's] memorandum and pleadings are insufficient to repel summary judgment"); Fed.R.Civ.P. 56(e) (requiring non-moving party to "set forth specific facts showing that there is a genuine issue for trial.")

### *Noerr–Pennington Immunity*

▆▆▆▆ The so-called Noerr–Pennington doctrine "provides broad antitrust immunity for defendants who have invoked administrative and judicial processes irrespective of anti-competitive intent[.]" *Miracle Mile Associates v. City of Rochester*, 617 F.2d 18, 20 (2d Cir.1980) (citing *Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 81 S.Ct. 523, 5 L.Ed.2d 464 (1961); *United Mine Workers v. Pennington*, 381 U.S. 657, 85 S.Ct. 1585, 14 L.Ed.2d 626 (1965)). Thus, pursuant to Noerr–Pennington, "mere solicitation of governmental action with respect to the passage and enforcement of laws" is protected by the First Amendment and, therefore, is immune from Sherman Act liability, *Noerr*, 365 U.S. at 138; *see also Pennington*, 381 U.S. at 670 ("*Noerr* shields from the Sherman Act a concerted effort to influence public officials regardless of intent or purpose.") The broad immunity granted by the Noerr–Pennington doctrine was also extended to proceedings before administrative agencies and the courts in *California Motor Co. v. Trucking Unlimited*, 404 U.S. 508, 510, 514, 92 S.Ct. 609, 30 L.Ed.2d 642 (1972).[20]

**19.** In addition, Cheminor argues that Ethyl's claim that it decided to withdraw its Petition because of the legal fees it would have incurred is implausible because: (1) the remaining stages of the USITC case merely involved responding to a questionnaire and optional participation in further procedures; and (2) Ethyl had the option of appearing without legal counsel, as many petitioners do. Cheminor 12G ¶¶ 189–91.

**20.** In *California Motor Transport Co., v. Trucking Unlimited*, 404 U.S. 508, 92 S.Ct. 609, 30 L.Ed.2d 642, respondent highway carriers filed an action pursuant to Section 4 of the Clayton Act claiming that the state and federal proceedings initiated by the petitioner highway carriers against respondents amounted to "sham" litigation. Specifically, respondents alleged that petitioners instituted "state and federal proceedings to resist and defeat applications by respondents to acquire operating rights or to transfer or regis-

ter those rights. These activities ... extend to rehearings and to reviews or appeals from agency or court decisions on those matters." *Id.* at 509. Respondents claim that the real purpose of petitioners' litigation was to put "their competitors [respondents] ... out of business". *Id.* at 511. Petitioners claimed they were protected from respondents' antitrust claims pursuant to the Noerr Pennington doctrine. *Id.* Citing to *Noerr* and *Pennington*, the Court held that "[t]he same philosophy governs the approach of citizens or groups of them to administrative agencies (which are both creatures of the legislature and arms of the executive) and to court, the third branch of Government. Certainly the right to petition extends to all departments of the Government." *Id.* at 510. The Court concluded that petitioners' allegations, on their face, came within the "sham" exception articulated in the Noerr case. The case was therefore remanded for trial on respondents' antitrust claims. *Id.* at 515–16.

■ The Court in *Noerr*, however, also held that immunity may not be enjoyed when the underlying litigation or solicitation of governmental action is determined to be "a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." 365 U.S. at 144; *see also Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc.,* 508 U.S. 49, 57, 113 S.Ct. 1920, 123 L.Ed.2d 611 (1993) (*"PRE"*) (Court withheld immunity from "sham" transactions "because 'application of the Sherman Act' would be justified when petitioning activity, 'ostensibly directed toward influencing governmental action, is a mere sham to cover … an attempt to interfere directly with the business relationships of a competitor.' ") (citation omitted).

■ The Court in *PRE* outlined a two-part test which defined "sham" litigation and the circumstances in which the immunity exception to the Noerr–Pennington doctrine applies:

First, the lawsuit must be *objectively baseless* in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our definition of sham, the court should focus on whether the baseless lawsuit conceals "an attempt to interfere directly with the business relationships of a competitor," through the use [of] the governmental process—as opposed to the outcome of that process—as an anticompetitive weapon[.] This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

508 U.S. at 60–61 (emphasis added) (citations omitted).

■ Moreover, "[t]he existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation" *Id.* at 62. The Court added in *PRE* that probable cause is proven when the Plaintiff shows "that the Defendant pressed the action for an improper, malicious purpose." *Id.* (citations omitted). In short, "[p]robable cause to institute civil proceedings requires no more than a 'reasonabl[e] belie[f] that there is a chance that [a] claim may be held valid upon adjudication.' " *Id.* at 62–63 (citations omitted); *see also Christiansburg Garment Co. v. EEOC,* 434 U.S. 412, 422, 98 S.Ct. 694, 54 L.Ed.2d 648 (1978) ("[e]ven when the law or the facts appear questionable or unfavorable at the outset, a party may have an entirely reasonable ground for bringing suit.")

Defendant in this case points to *Music Center S.N.C. Di Luciano Pisoni & C. v. Prestini Musical Instruments Corp.,* 874 F.Supp. 543 (E.D.N.Y.1995), as an example of a case where the court did not view the defendant's act of filing a petition with the USITC as "objectively baseless" even though the antidumping petition at issue was ultimately unsuccessful. In *Music Center,* the plaintiffs—an Italian manufacturer of key-pads; for woodwind instruments, and a New York importer of these products—sued an American competitor and its principal. Plaintiffs alleged violations of the Sherman Act, as well as state law claims of unfair trade practices, abuse of process and wrongful institution of civil proceedings. Plaintiffs also alleged, *inter alia,* that the defendants made misrepresentations in their antidumping petitions filed with the USITC. However, the USITC had previously made preliminary determinations that (1) the petition was sufficient to initiate an investigation and (2) there was a reasonable indication that the key pad industry in the U.S. was being materially injured by sales at LTFV. *Id.* at 553–54.

However, ultimately, the petition at issue in *Music Center* was unsuccessful, and the USITC, in its final determination found that, despite its initial finding of sales at LTFV, the industry in the U.S. was not being materially injured by reason of imports sold at LTFV. *Id.* at 554. Nevertheless, the court held that the prior antidumping petitions filed by the Defendant corporation could not

be viewed as "objectively baseless", so as to allow an antitrust suit by the target of the antidumping investigation. *Id.* at 552–55. Specifically, the court held that:

> [t]he possibility does exist, however remote, that the institution of two unsuccessful antidumping proceedings nine years apart was intended solely to injure plaintiffs competitively in a trade war that defendants appear to be losing, and not to secure the trade relief for which such petitions were created by Congress. Even if such a malevolent intent could be shown, plaintiffs cannot sustain their burden of proving that defendants could not have reasonably expected success on the merits.

*Id.* at 554–55.

Moreover, the court in *Music Center* added that "an inaccurate petition, even one containing deliberate misstatements, might nonetheless not be so lacking in merit as to be objectively baseless." *Id.* at 549. Articulating the policy considerations behind its application of Noerr–Pennington, the court also said:

> To allow antitrust claims based solely on broad and indistinct allegations of misrepresentation and "sham litigation" to reach discovery, regardless of the role the claimed misrepresentations played, or could have played, in the prior proceeding, would predicate the viability of an antitrust complaint on a petitioner's subjective intent, and not the objective merit of its petition, and thus directly contravene the Supreme Court's holding in PRE. Moreover, such discovery would have the effect of encouraging antitrust "strike suits", and effectively chill the First Amendment rights which Noerr immunity was intended to protect.

*Id.* (citations omitted); *see also PRE,* 508 U.S. at 60 ("fidelity to precedent compels us to reject a purely subjective definition of 'sham.' The sham exception so construed would undermine, if not vitiate Noerr."); [21] *Bio–Technology General Corp. v. Genentech,*

*Inc.,* 886 F.Supp. 377, 380 (S.D.N.Y.1995) ("The Noerr–Pennington doctrine, which has its roots in the First Amendment, ensures that those who petition the government in good faith for redress are generally immune from antitrust liability.") (citations omitted).

■ In this case, Ethyl filed a Petition with the USITC, alleging that it was being materially injured, and threatened with material injury, because Cheminor was "dumping" subsidized bulk ibuprofen in the U.S. market. On September 16, 1991, the USITC issued its preliminary determination, in which it found that there was a reasonable indication that the ibuprofen industry in the U.S. was materially injured by reason of imports of bulk ibuprofen, which was allegedly being subsidized by the Government of India and sold in the U.S. Leonard Certif. ¶ 17. The USITC cited two separate and distinct indications of material injury: (1) that Ethyl's "financial trends" demonstrated material injury; and (2) that "other factors, such as apparent domestic consumption and market share, further provide a reasonable indication of present injury." USITC Report at 16. On December 13, 1991, the DOC also made a preliminary determination in favor of Ethyl, finding a subsidy in the amount of 43.71%. Additionally, on February 27, 1992, the DOC preliminarily determined that imports of bulk ibuprofen from India were being sold in the U.S. at LTFV and that there was an estimated dumping margin of 115.94%. Leonard Certif. ¶ 26. These preliminary determinations contained three separate and distinct components: the DOC's findings of subsidization and dumping, and the USITC's finding of material injury or threat of material injury.

However, even if the Court were (1) to ignore these preliminary determinations and be unwilling (2) to find that Ethyl's Petition would ultimately have been "successful", in order to prevail in the instant lawsuit Cheminor must establish that Ethyl did not have a reasonable basis for filing the Petition. *See PRE,* 508 U.S. at 62 ("[u]nder the objective

---

21. The *PRE* Court left open the specific question of "whether and, if so, to what extent Noerr permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." 508 U.S. at 61 n. 6 (citations omitted). The

Court did state, however, that "[t]o be sham . . . . litigation must fail to be 'genuine'" and that "genuine" means "sincerely and honestly felt or experienced." *Id.* at 61.

prong of the sham exception, the Court of Appeals correctly held that sham litigation must constitute the pursuit of claims so baseless that no reasonable litigant could realistically expect to secure relief.") Cheminor has not presented any evidence suggesting that the preliminary determinations in favor of Ethyl were wrong or that Ethyl did not have a reasonable basis for claiming that bulk ibuprofen from India was being subsidized by the Government of India and dumped into the U.S. market. Rather, plaintiffs have largely ignored the DOC's findings of underpricing and the USITC's conclusions regarding the sharply increasing volume of Cheminor's imports. Instead, plaintiffs have based their lawsuit against Ethyl on allegations that it (Ethyl) had misrepresented the condition of the ibuprofen business and manipulated its financial documents.

The USITC Report cited two separate and distinct reasons to support its finding of material injury: (1) that Ethyl's "financial trends" demonstrated material injury; and (2) that "other factors, such as apparent domestic consumption and market share, further provide a reasonable indication of present injury." USITC Report at 16. More specifically, the USITC began its injury analysis by identifying the factors it would consider in making its injury determination; they included domestic consumption, production, capacity, capacity utilization, shipments, inventories, employment, financial performance, capital investment, and research and development efforts. Id. at 15–16. In articulating the bases for its conclusion that Ethyl was being materially injured, the USITC stated: first, that "financial trends provide a reasonable indication of present material injury" and second, that "other factors, such as apparent domestic consumption and market share, further provide a reasonable indication of present injury." Id. at 16. In addition, in the section of the USITC Report entitled "Additional Views of Acting Chairman Anne

E. Brunsdale", Chairman Brunsdale bases her conclusion of material injury on the following three factors: (1) "the subject imports are quite substitutable" for domestic bulk ibuprofen, (2) "the alleged dumping and subsidy margins in these investigations are quite high" and (3) the share of U.S. bulk ibuprofen market accounted for by the Indian imports is not small enough to ensure that there is no material injury. Id. at 26–27.

Plaintiffs' allegations of misrepresentation focus on Ethyl's financial documents and have nothing to do with "domestic consumption" or "market share"—factors relied on by the USITC. Plaintiffs' misrepresentation allegations also have nothing to do with imports, dumping and subsidy margins or market share—the factors relied on by Chairman Brunsdale in her conclusion of material injury. Thus, even assuming, arguendo, that Ethyl misrepresented its financial information,[22] plaintiffs have not proven that the Petition was "objectively baseless."—i.e., amounting to nothing more than "sham litigation".

Plaintiffs made the point during oral argument that Ethyl loses its protection under PRE because of the alleged misrepresentations it made to the USITC. Tr. at 27. The PRE Court, however, left open the specific question of "whether and, if so, to what extent Noerr permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations." 508 U.S. at 61 n. 6 (citations omitted). The court in Music Center, 874 F.Supp. at 549, stated that "an inaccurate petition, even one containing deliberate misstatements, might nonetheless not be so lacking in merit as to be objectively baseless." Moreover, the Federal Court in Nobelpharma v. Implant Innovations, Inc., 129 F.3d 1463 (Fed.Cir.1997) (patent infringement case where the infringer counterclaimed for antitrust violations), specifically analyzed footnote six in the PRE decision.

22. Here, the Court need not address the second part of the PRE Court's two-part definition of "sham" litigation and determine whether there is subjective evidence that Ethyl misrepresented its financial documents to the USITC in order to "interfere directly" with "the business relationships of [its] ... competitor [Cheminor]". 508 U.S. at 60–61. Rather, "[i]f an objective litigant

could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail." Id. at 60. There is no evidence in this case that Ethyl's lawsuit was "objectively baseless". Therefore, under PRE, this Court does not need to go any further in its analysis.

In *Nobelpharma*, the Federal Circuit reversed the trial court's decision, stating that "the district court made its own determination that PRE's two-part test for a sham is inapplicable to an antitrust claim based on the assertion of a patent obtained by knowing and willful fraud. We do not agree with that determination." *Id.* at 1471. The court stated that:

PRE and Walker Process provide alternative legal grounds on which a patentee may be stripped of its immunity from the antitrust laws; both legal theories may be applied to the same conduct. Moreover we need not find a way to merge these decisions. Each provides its own basis for depriving a patent owner of immunity from the antitrust laws. The Supreme Court saw no need to merge these separate lines of cases and neither do we.

\* \* \* \*

If the elements for finding a fraud within the meaning of Walker Process, as well as other criteria for antitrust liability, are met, such liability can be imposed without an additional sham inquiry. Alternatively, when an antitrust claim is based on a PRE allegation that a suit is baseless, in order to prove that a suit is within Noerr's "sham" exception to immunity, an antitrust plaintiff must prove that the suit was both objectively baseless and subjectively motivated by a desire to impose collateral, anticompetitive injury rather [sic]to obtain a justifiable legal remedy ... Thus, under PRE, a sham suit is one that is both objectively baseless and subjectively brought in bad faith. If a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial.

*Id.* at 1471–72. Additionally, although misrepresentation is a big part of plaintiffs' argument in its opposition to this motion, the Amended Complaint does not include a fraud claim against the defendants. The conclusory references to fraud in the fact section of the Amended Complaint do not comport with the particularity requirement of Fed.R.Civ.P. 9(b). *See* Hansen Certif.Ex. J.

Accordingly, in order for an antitrust claim based on the sham litigation exception to Noerr–Pennington to survive, plaintiffs must demonstrate that there was absolutely no objective merit to Ethyl's Petition—i.e., that the Petition amounted to "sham" litigation or to claims "so baseless that no reasonable litigant could realistically expect to secure favorable relief." 508 U.S. at 62. Plaintiffs in this case have failed to demonstrate that there is a genuine issue as to a material fact regarding the "objective basis" of Defendant's Petition. *See Nobelpharma*, 129 F.3d at 1472 ("If a suit is not objectively baseless, an antitrust defendant's subjective motivation is immaterial.") Defendant is therefore immune from antitrust liability pursuant to the First Amendment and the Noerr–Pennington doctrine. Accordingly, defendant Ethyl is entitled to summary judgment as to plaintiffs' antitrust claims.[23]

### State Law Claims

This Court cannot exercise supplemental jurisdiction over state law claims unless, at a minimum, there is:

a federal claim of sufficient substance to confer subject matter jurisdiction on the court. The substantiality of the federal claim is ordinarily determined on the basis of the pleadings. If it appears that the federal claim is subject to dismissal under F.R.Civ .P. 12(b)(6) or could be disposed of on a motion for summary judgment under F.R.Civ.P. 56, then the court should ordinarily refrain from exercising jurisdiction in the absence of extraordinary circumstances.

*Tully v. Mott Supermarkets, Inc.*, 540 F.2d 187, 195–96 (3d Cir .1976) (citations omitted);

---

23. Plaintiffs federal antitrust claim against the defendants is vitiated by the Noerr–Pennington doctrine. To the extent that plaintiffs allege a separate antitrust claim pursuant to state law, courts have consistently found that the failure to state viable federal antitrust claims is fatal to state antitrust claims. *Inter–City Tire and Auto Center, Inc. v. Uniroyal, Inc.*, 701 F.Supp. 1120, 1124–25 (D.N.J.1988), *aff'd*, 888 F.2d 1380 (3d Cir.1989); *see also Regency Oldsmobile, Inc. v. General Motors Corp.*, 723 F.Supp. 250, 270 (D.N.J.1989) (Because Defendant is entitled to summary judgment on Plaintiff's "federal antitrust claims, it is also entitled to a like judgment on [Plaintiff's] ... state antitrust claims.")

*see also Queen City Pizza, Inc. v. Domino's Pizza, Inc.,* 124 F.3d 430 (3d Cir.1997) (court declined to exercise supplemental jurisdiction over breach of contract, breach of implied covenants of good faith and fair dealing and tortious interference with contract claims after dismissing federal antitrust claim pursuant to Fed.R.Civ.P. 12(b)(6)). Whether or not a district court chooses to exercise supplemental jurisdiction over remaining state law claims is a matter of "sound discretion". *Id* . at 444. In making this decision, the court should consider whether dismissal would "be unfair to the litigants or result in waste of judicial resources". *Id.*[24]

 Plaintiffs in this case allege a number of state law claims against the defendant Ethyl. Specifically, plaintiffs allege claims of malicious prosecution, abuse of process, tortious interference with a contract and with a prospective economic advantage and unfair competition. However, pursuant to the Noerr–Pennington immunity doctrine, plaintiffs' federal antitrust claim is subject to dismissal by this Court. Accordingly, given that there are no "extraordinary circumstances" justifying retention of supplemental jurisdiction over the state law claims in this case and that there is no evidence that dismissal would be "unfair to the litigants or result in waste of judicial resources", the Court dismisses plaintiffs' remaining state law claims against Ethyl.

## CONCLUSION

For the reasons stated above, defendant Ethyl's motion for summary judgment is granted in its entirety.

## ORDER

This matter having been opened to the Court by Lowenstein, Sandler, Kohl, Fisher & Boylan, attorneys for defendant Ethyl Corporation ("Ethyl"), and the Court having considered the submissions of the parties and having heard oral argument, and good cause appearing,

IT IS on this 5th day of February, 1998,

ORDERED that defendant's motion for summary judgment, pursuant to Fed. R.Civ.P. 56(c), for an Order of dismissal of the Complaint is hereby granted; and

IT IS FURTHER ORDERED that a copy of this Order be served on all parties within seven (7) days of the date of this Order.

---

**24.** 28 U.S.C. § 1367(c) is the applicable supplemental jurisdiction statute, stating that:

(C) the district courts may decline to exercise supplemental jurisdiction over a claim under subsection (a) if—

(1) the claim raises a novel or complex issue of State law,

(2) the claim substantially predominates over the claim or claims over which the district court has original jurisdiction,

(3) the district court has dismissed all claims over which it has original jurisdiction, or

(4) in exceptional circumstances, there are other compelling reasons for declining jurisdiction.