

1999 Decisions

Opinions of the United
States Court of Appeals
for the Third Circuit

3-1-1999

# Cheminor Drugs v. Ethyl Corp

Precedential or Non-Precedential:

Docket 98-6004

Follow this and additional works at: http://digitalcommons.law.villanova.edu/thirdcircuit_1999

Recommended Citation

"Cheminor Drugs v. Ethyl Corp" (1999). *1999 Decisions.* Paper 51.
http://digitalcommons.law.villanova.edu/thirdcircuit_1999/51

This decision is brought to you for free and open access by the Opinions of the United States Court of Appeals for the Third Circuit at Villanova
University School of Law Digital Repository. It has been accepted for inclusion in 1999 Decisions by an authorized administrator of Villanova
University School of Law Digital Repository. For more information, please contact Benjamin.Carlson@law.villanova.edu.

Filed March 1, 1999

UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

No. 98-6004

CHEMINOR DRUGS, LTD.;
REDDY-CHEMINOR, INC.,

        Appellants

v.

ETHYL CORPORATION;
JOHN DOES 1 THROUGH 10

On Appeal from the United States District Court
for the District of New Jersey
(D.C. No. 94-cv-04371)
District Judge: Honorable Joseph A. Greenaway, Jr.

Argued Friday, October 30, 1998

BEFORE: SLOVITER, GARTH, and MAGILL,*
Circuit Judges

(Opinion filed March 1, 1999)

        Andrew J. Miller (Argued)
        Budd Larner Gross Rosenbaum
         Greenberg & Sade, P.C.
        150 John F. Kennedy Parkway
        Short Hills, New Jersey 07078

Attorneys for Appellants

_____

*Hon. Frank J. Magill, Senior United States Circuit Judge for the Eighth
Circuit, sitting by designation.

        Douglas S. Eakeley (Argued)
        Timothy G. Hansen, Esq.
        Lowenstein Sandler PC
        65 Livingston Avenue
        Roseland, New Jersey 07068

        Attorneys for Appellee

OPINION OF THE COURT

GARTH, Circuit Judge:

This appeal requires us to analyze whether alleged misrepresentations by the defendant Ethyl Corp. ("Ethyl")1 vitiates application of the immunity afforded by the Noerr–Pennington doctrine and thus defeats Ethyl's "objective basis" for petitioning the government for protection of its bulk ibuprofen industry from imports of bulk ibuprofen by plaintiffs Cheminor Drugs, Ltd. and Reddy–Cheminor, Inc. (collectively, "Cheminor").

Cheminor's ibuprofen exports to the United States were found to be heavily subsidized by the Government of India ("India"), and Cheminor was found to sell its imported ibuprofen in the United States at substantially less than fair value. The District Court granted summary judgment in favor of Ethyl, holding that Ethyl's petition was not a "sham" and was thus protected activity pursuant to the First Amendment of the United States Constitution. We affirm.

I.

Cheminor and Ethyl are both manufacturers of bulk ibuprofen for sale to tableters; Cheminor is an Indian

_____

1. The Amended Complaint lists the defendants as "Ethyl Corporation and John Does 1–10." It describes the "Doe" defendants as "individuals and corporate entities including Ethyl's employees, agents, and unrelated corporate entities which conspired with Ethyl in the misconduct alleged in the complaint." For ease in reference, we will refer throughout this opinion to all defendants as "Ethyl."

company, and Ethyl is a United States company. On July 31, 1991, Ethyl complained to the United States International Trade Commission ("ITC") and the Department of Commerce ("DOC") about Cheminor's dumping of ibuprofen and its sale at less than fair value, and Ethyl alleged that India was subsidizing the manufacture of the ibuprofen. After receiving information from Ethyl through its petition and a detailed questionnaire, the ITC and DOC made preliminary determinations that Cheminor would be taxed on its imports because it was receiving subsidies from India, it was dumping ibuprofen at less than fair value in the United States, and the domestic industry suffered material injury as a result. Before final determinations could be made, however, Cheminor withdrew from the U.S. market -- its sole distributor, Flavine International, Inc., canceled its orders for ibuprofen because the cost to be charged by Cheminor was prohibitive. Ethyl then withdrew its complaint from the ITC and DOC on March 4, 1992, stating that it would refile if necessary.

Cheminor then brought federal and state antitrust claims and various state common law claims against Ethyl by a complaint filed in the District Court for the District of New Jersey. Cheminor moved for summary judgment, claiming that Ethyl's administrative complaints to the ITC about Cheminor's below-market pricing and the resultant injuries to Ethyl were baseless, made in bad faith, contained false statements, and were brought only for anti-competitive reasons. In response, Ethyl asserted that its administrative complaints had a legal basis, were made in good faith, and were truthful. As such, Ethyl argued that the Noerr-Pennington doctrine, which protects the right of citizens and corporations to petition the government for grievances and is based on the First Amendment of the United States Constitution, prohibits Cheminor's antitrust and unfair trade claims.

The District Court granted Ethyl's motion for summary judgment, holding that Ethyl was protected from Cheminor's federal and state antitrust claims by Noerr-Pennington immunity. Specifically, the District Court held that no genuine issues of fact existed on the question of whether Ethyl had an objective basis to file a petition with

the ITC and the DOC. In addition, the District Court, in its discretion, declined to exercise supplemental jurisdiction, 28 U.S.C. S 1367(c), over Cheminor's tort claims brought under state law. The District Court did not consider whether it had diversity jurisdiction under 28 U.S.C. S 1332.

Summary judgment was entered on behalf of defendant Ethyl on February 5, 1998, disposing of all claims against all parties.2 Plaintiff Cheminorfiled its notice of appeal on March 3, 1998. The District Court had subject matter jurisdiction pursuant to 28 U.S.C. SS 1331 and 1332. We exercise jurisdiction pursuant to 28 U.S.C. S 1291.

Summary judgment is appropriate if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). We give the grant of summary judgment plenary review.

II.

If a United States business or industry believes that it is being injured by foreign-made subsidized products that are imported into the United States and sold at less than fair value, the business or industry may seek relief from the ITC by filing an antidumping ("AD") and countervailing duty ("CVD") petition ("AD/CVD petition")3 with the ITC and the DOC4 to obtain relief in the way of extra duties to offset alleged subsidies.

_____

2. The District Court's order of February 5, 1998 granted Ethyl's motion for summary judgment pursuant to Federal Rule of Civil Procedure 56(c) "for an Order of dismissal of the Complaint." App. 3088. Because the grant of summary judgment and the dismissal of the complaint are inconsistent, we will disregard reference to the"dismissal" of Cheminor's complaint and treat the record as a summary judgment record.

3. The CounterVailing Duty investigation inquires whether the foreign company received subsidies from its government. The AntiDumping investigation deals with the question of whether the foreign company actually brought the subsidized goods into the United States and sold them for less than fair value.

4. The ITC and the DOC divide up the investigation. The ITC determines whether the domestic industry has suffered material injury; the DOC

4

An AD/CVD petition receives consideration at two levels. First, preliminary determinations of subsidies and antidumping are made by DOC and a preliminary determination of "material injury" or "threat of material injury" to the domestic industry is made by the ITC. The DOC and the ITC base their preliminary determinations upon the complaining firm's petition and questionnaire, the respondent firm's questionnaire, if available, and argument from all interested parties' counsel. Second, once the preliminary determinations have been made in petitioner's (here, Ethyl's) favor, the DOC imposes duties upon the imported product. The DOC and ITC make final determinations after they have conducted their own investigations (collecting information apart from the complainant's petition and questionnaire) and after they have heard further arguments from the parties involved.[5]

On September 16, 1991, based upon the "best information available,"[6] the ITC made a preliminary determination that there was material injury to the domestic market[7] caused by Cheminor's receipt of subsidies from the Indian government and dumping of bulk ibuprofen into the United States market at less than fair value. App. 2077–2147 (ITC report). On December 13, 1991, the DOC made a preliminary determination of countervailing duty (CVD). DOC determined that India had subsidized

_____

determines whether the foreign company has received foreign government subsidies and whether the foreign company has been dumping product at less than fair value.

5. In a preliminary determination, the ITC must determine whether there is a reasonable indication of material injury or the threat thereof to the domestic industry "by reason of" the imports under investigation. In its final determination, the ITC must determine that there is a material injury or threat thereof to the domestic industry by reason of the imports under investigation.

6. The best information available comprised Ethyl's petition and questionnaire and arguments from the parties' counsel -- Cheminor refused to submit verified information to the ITC.

7. Ethyl's ibuprofen constituted the entire domestic market because it was the only domestic manufacturer of ibuprofen at the time the petition was filed.

Cheminor in the amount of 43.71%, and thus DOC imposed a 43.71% ad valorem duty on Cheminor's ibuprofen. App. 1471.[8] On January 13, 1992, Cheminor informed the ITC and DOC that it would be withdrawing from the United States market.

On February 27, 1992, DOC made a preliminary determination on the antidumping (AD) petition. DOC found that imports of ibuprofen from India were being sold in the United States at less than fair value and that there was an estimated dumping margin of 115.94%. App. 1472.[9] Ethyl withdrew its AD/CVD petition on March 4, 1992, stating that it no longer believed it could succeed in a final determination based on its then new profit figures and Cheminor's decision to exit the United States market.

III.

A party who petitions the government for redress generally is immune from antitrust liability. Eastern R.R. Presidents Conference v. Noerr Motor Freight, 365 U.S. 127 (1961); United Mine Workers of Am. v. Pennington, 381 U.S. 657 (1965) ("Noerr-Pennington doctrine"). This immunity extends to persons who petition all types of government entities -- legislatures, administrative agencies, and courts. California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510 (1972) ("The right of access to the courts is indeed but one aspect of the right of petition."). "[W]here restraint upon trade or monopolization is the result of valid

_____

8. The Government of India subsidized the production of bulk ibuprofen for export by establishing: (1) below interest rate loans for exporters, (2) post-shipment financing loans to enable exporters to extend credit to foreign buyers, (3) tax deductions for foreign sales, (4) a rebate of indirect taxes on exported merchandise, and (5) duty-free importation of raw materials used in exported products (Advance licenses). App. 2172-82.

9. The basic formula for determining a dumping margin is defined as "the amount by which the normal value exceeds the export price or constructed export price of the subject merchandise." 19 U.S.C. S 1677(35). The actual determination of the dumping margin requires substantial economic analyses. See, e.g., Raj Bhala, Rethinking Antidumping Law, 29 Geo. Wash. J. Int'l L. & Econ. 1, 30-50 (1995).

governmental action, as opposed to private action, no violation of the [Sherman] Act can be made out." Noerr, 365 U.S. at 136 (citations omitted).

Noerr-Pennington immunity does not apply, however, to petitions or lawsuits that are a "mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationships of a competitor." Noerr, 365 U.S. at 144. Often, a petition to the government causes an anti-competitive effect, but "evidence of anticompetitive intent or purpose alone cannot transform otherwise legitimate activity into a sham." Professional Real Estate Investors v. Columbia Pictures Indus., Inc., 508 U.S. 49, 57-58 (1993) ("PRE").

In PRE, the Supreme Court held that litigation is a sham if the lawsuit is "objectively baseless." But "[t]he existence of probable cause to institute legal proceedings precludes a finding that an antitrust defendant has engaged in sham litigation." Id. at 62. The Court then stated, "Probable cause to institute civil proceedings requires no more than a reasonable belief that there is a chance that a claim may be held valid upon adjudication. . . . the existence of probable cause is an absolute defense." Id. at 62-63 (internal quotation marks, brackets, and citations omitted). The Court concluded its discussion by stating "a proper probable-cause determination irrefutably demonstrates that an antitrust plaintiff [here, Cheminor] has not proved the objective prong of the sham exception and that the defendant [here, Ethyl] is accordingly entitled to Noerr immunity." Id. at 63.

It was in this context that the Court announced a two-step test:

> First, the lawsuit must be objectively baseless in the sense that no reasonable litigant could realistically expect success on the merits. If an objective litigant could conclude that the suit is reasonably calculated to elicit a favorable outcome, the suit is immunized under Noerr, and an antitrust claim premised on the sham exception must fail. Only if challenged litigation is objectively meritless may a court examine the litigant's subjective motivation. Under this second part of our

7

definition of sham, the court should focus on whether the baseless lawsuit conceals an attempt to interfere directly with the business relationships of a competitor, through the use of governmental process-- as opposed to the outcome of that process -- as an anticompetitive weapon. This two-tiered process requires the plaintiff to disprove the challenged lawsuit's legal viability before the court will entertain evidence of the suit's economic viability.

508 U.S. at 60-61 (1993) (citations omitted) (emphasis in original). Accordingly, applying the Court's Noerr-Pennington immunity test to Ethyl's petition, we must determine whether Ethyl had probable cause to file its petition, and in making that determination, we must be satisfied that the petition filed was not objectively baseless in the sense that Ethyl could not reasonably expect success on the merits.10

The Supreme Court has not addressed how alleged misrepresentations affect Noerr-Pennington immunity or the sham exception to Noerr-Pennington immunity. In PRE, the Court explicitly declined to decide whether the sham exception to immunity would include situations where the litigant had perpetrated "fraud" or had made "other misrepresentations." Id. at 61 n.6.11 Cheminor argues either that Noerr-Pennington immunity does not apply at all to petitions containing misrepresentations or that Ethyl's

_____

10. We recognize that the second step of the Supreme Court's test comes into play only if the petition is objectively baseless and therefore without
probable cause. Because, as discussed infra, we are satisfied that Ethyl's petition was not "objectively baseless," and that Ethyl had probable cause to file its petition, we have no need to discuss Ethyl's subjective intent, which is the subject of the second part of the Supreme Court's definition of sham.

11. In footnote six of PRE, the Court cited Fed. R. Civ. P. 60(b)(3), which
allows a federal court to "relieve a party . . . from a final judgment" for
"fraud . . . misrepresentation, or other misconduct of an adverse party." The Court also cited Walker Process Equip., Inc. v. Food Machinery & Chem. Corp., 382 U.S. 172, 176-77 (1965); id. at 179-80 (Harlan, J., concurring), in which the Court held that a purported patent-holder could not avoid antitrust liability for his suit against an alleged infringer
if the purported patent-holder's patent was based upon material misrepresentations.

8

alleged misrepresentations led to the conclusion that the Ethyl's AD/CVD petition to the ITC and DOC was objectively baseless.

We decline to carve out a new exception to the broad immunity that Noerr-Pennington provides. Rather, we will determine whether Ethyl's petition was objectively baseless under the Supreme Court's test in PRE, without regard to those facts that Cheminor alleges Ethyl misrepresented. If the alleged misrepresented facts do not infect the core of Ethyl's claim and the government's resulting actions, then the petition had an objective basis and will receive Noerr-Pennington immunity under the first step of PRE. While we do not condone misrepresentations in a judicial setting, neither will we deprive litigants of immunity derived from the First Amendment's right to petition the government if the alleged misrepresentations do not affect the core of the litigant's (here, Ethyl's) case. We note that other remedies such as provided by under Federal Rules of Civil Procedure 11 and 60(b)(3), exist for alleged misrepresentations that do not taint the core of the litigant's case. See supra note 11.

In Music Center S.N.C. De Luciano Pisoni & C. v. Prestini Musical Instruments Corp., 874 F. Supp. 543, 549 (E.D.N.Y. 1995), the court was faced with circumstances similar to the circumstances we face here. Because we agree with the matters noted for consideration by the Music Center court, we will evaluate the information upon which the instant petition was based as the court in Music Center evaluated the circumstances there:

> [A] determination [of objective basis] requires consideration, inter alia, of the outcome of the proceedings, including the findings made by the relevant administrative tribunals, the nature of the particular allegations of the petition or actions before the administrative agency claimed to be fraudulent or improper, and whether these claimed misrepresentations or improper actions would have been significant to the ultimate outcome or continuation of the proceeding.

Music Center, 874 F. Supp. at 549 (holding that defendants were entitled to Noerr-Pennington immunity for filing

AD/CVD petition despite allegations of misrepresentations in the petitions because the defendants had an objective basis for filing the petitions). If the government's action was not dependent upon the misrepresented information, the misrepresented information was not material and did not go to the core of Ethyl's petition. In sum, a material misrepresentation that affects the very core of a litigant's (here, Ethyl's) case will preclude Noerr-Pennington immunity, but not every misrepresentation is material to the question of whether a petition such as Ethyl's had an objective basis.12

IV.

We will assume, for the purposes of determining whether Ethyl had an objective basis to file its AD/CVD petition, that the statements that Ethyl made in its petition and questionnaire and are alleged by Cheminor to be false were, in fact, false. We note, however, that if this case were to proceed to trial, Cheminor might not be able to prove that they were false, as Ethyl has articulated reasonable explanations for the truth of their statements, or at least, that the representations made as to its financial condition were reasonable estimates of the profits Ethyl would sustain based upon predictions of various research and development costs and capital expenditures.

---

12. Our approach in requiring that misrepresentations must be material to bar Noerr-Pennington immunity is consistent with the two other circuit courts of appeals that have considered this issue. The Ninth Circuit held that Noerr-Pennington immunity does not extend to parties who make knowing material misrepresentations in the course of a litigative proceeding. See Kottle v. Northwest Kidney Ctrs., 146 F.3d 1056 (9th Cir. 1998) (citing Clipper Exxpress v. Rocky Mountain Motor Tariff, 690 F.2d 1240, 1260 (9th Cir. 1980)). The District of Columbia Circuit disallowed a Noerr-Pennington defense in an action for common law torts because the defendants had made material misrepresentations to state securities regulators. Whelan v. Abell, 48 F.3d 1247 (D.C. Cir. 1995). Moreover, misrepresentations made to procure a patent must rise to the level of fraud in order to cause a patent infringement action to fail -- unethical behavior alone is insufficient. Nobelpharma AB v. Implant Innovations, Inc., 141 F.3d 1059, 1070-71 (Fed. Cir. 1998) (discussing Walker Process Equip., Inc. v. Food Machinery & Chem. Corp., 382 U.S. 172 (1965)).

10

To have an objective basis to file a AD/CVD petition with the ITC and DOC, Ethyl must have had a reasonable belief that Cheminor was dumping ibuprofen that was subsidized by India in the United States at less than fair value, and that the dumping caused material injury or threat of material injury to the domestic market.[13]  We are satisfied that Ethyl had such an objective basis because (1) India was subsidizing at a rate of 43.71% Cheminor's production of ibuprofen; (2) Cheminor was dumping the subsidized ibuprofen in the United States at a 115.42% margin; and (3) Ethyl was suffering material injury or was threatened with material injury as a result of the dumping.

Cheminor takes issue with only one of these three conclusions -- that Ethyl was suffering material injury or that it was threatened with material injury. 19 U.S.C. S 1677(7). Under the statute, the ITC must make three determinations before it can find "material injury:"

> (I) the volume of the imports of the subject merchandise, (II) the effect of the imports of that merchandise on prices in the United States for domestic like products, and (III) the impact of imports of such merchandise on domestic producers of domestic like products, but only in the context of production operations within the United States.

19 U.S.C. S 1677(7)(B)(i)(I)-(III) (emphasis added). In addition, the ITC "may" consider other "relevant" economic factors. 19 U.S.C. S 1677(7)(B)(ii). The statute goes on to expand upon and define each of the three required determinations of 19 U.S.C. S 1677(7)(B)(i)(I)-(III). Of concern here is the third (III) required determination for material injury, i.e., the impact of the imports on the domestic producers (underlined above).

This third determination is further defined by reference to factors in 19 U.S.C. S 1677(7)(C)(iii)(I)-(V):

_____

13. See Gerald Metals, Inc. v. United States, 132 F.3d 716, 719-20 (Fed. Cir. 1997); American Spring Wire Corp. v. United States, 590 F. Supp. 1273, 1276 (C.I.T. 1984); SMC Corp. v. United States, 544 F. Supp. 194, 199-200 (C.I.T. 1982).

(iii) Impact on affected domestic industry

In examining the impact required to be considered under subparagraph (B)(i)(III), the Commission shall evaluate all relevant economic factors which have a bearing on the state of the industry in the United States, including, but not limited to --

(I) actual and potential decline in output, sales, market share, profits, productivity, return on investments, and utilization of capacity,

(II) factors affecting domestic prices,

(III) actual and potential negative effects on cash flow, inventories, employment, wages, growth, ability to raise capital, and investment,

(IV) actual and potential negative effects on the existing development and production efforts in the domestic industry, including efforts to develop a derivative or more advanced version of the domestic like product, and

(V) in a proceeding under Part II of this subtitle, the magnitude of the margin of dumping.

The Commission shall evaluate all relevant economic factors described in this clause within the context of the business cycle and conditions of competition that are distinctive to the affected industry.

19 U.S.C. S 1677(7)(C)(iii)(I)-(V). The ITC has discretion to give these factors found in S 1677(7)(C)(iii)(I)-(V) of the trade statute varying degrees of weight in making its determination of material injury. SMC Corp. v. United States, 544 F. Supp. 194, 199-200 (C.I.T. 1982). A court reviews the ITC's (and DOC's) discretionary determinations by "evaluating whether they are `unsupported by substantial evidence on the record, or otherwise not in accordance with law.' " Gerald Metals, Inc. v. United States, 132 F.3d 716, 719 (Fed. Cir. 1997) (quoting 19 U.S.C. S 1516a(b)(1)(B)(i) (1994)). No one single fact about the domestic industry, the market, or the imported product is dispositive to the issue of material injury: the record as a whole requires evaluation. Music Center, 874 F. Supp. at 549.

12

Cheminor alleges that Ethyl gave the ITC inaccurate information regarding its profitability during the first half of 1991,14 which caused the ITC to determine erroneously that Ethyl had suffered material injury. Cheminor cites three alleged misrepresentations made by Ethyl that masked Ethyl's true profitability: (1) research and development costs and capital expenditures were allocated to thefirst half of 1991 but were not expected to be charged on Ethyl's books until the second half of 1991; (2) research and development costs for S+ ibuprofen should not have been included at all because S+ ibuprofen was not at issue in the AD/CVD petition; and (3) Ethyl falsified its lost sales resulting from Cheminor's imported product.15 All of these "false" statements, Cheminor alleges, resulted in the ITC's erroneous conclusion that Ethyl's profits were down while Cheminor's market share was up in the first half of 1991, which in turn caused the ITC to make a finding of material injury to Ethyl.

The statements in Ethyl's petition and questionnaire relating to Ethyl's profitability in the first half of 1991 bear on only a small proportion of the numerous factors the ITC must consider when making a determination of material injury. In the instant case, the ITC found that the domestic market had sustained material injury. The ITC issued a report explaining its decision to preliminarily grant Ethyl's AC/CVD petition. The ITC's finding set forth in the "Views of the Commission" that the domestic industry incurred injury, relied only in part on Ethyl's representations of its financial condition:

_____

14. Ethyl provided profitability data for the period 1988 through the first
six months of 1991. Among other charges, Cheminor alleges that the data for the first six months of 1991 was misrepresented. However, of the charges made by Cheminor, each was refuted by Ethyl in its brief to the Court, and in any event, each of Cheminor's charges were deemed to be not material by the ITC. See Appellee's Br. at 15–16; infra pp. 13–14 (discussing the views of the ITC).

15. Cheminor also alleges that Ethyl made misrepresentations regarding Cheminor's market share that made Cheminor's market share look larger than it really was. However, Cheminor was in a better position to inform the ITC and the DOC about its own market share, but, as we have noted previously, see supra note 6, Cheminor chose not to furnish the ITC or DOC with its market share information.

13

The financial trends provide reasonable indication of present material injury. For example, as illustrated by the public exhibit introduced by Ethyl at the conference, the industry's [Ethyl's] profitability (as measured by the profit-to-sales ratio) declined substantially from the beginning to the end of the investigatory period, despite an increase in 1989 from the 1988 level.

Confidential information concerning other factors, such as [Cheminor's] apparent domestic consumption and market share, further provide a reasonable indication of present injury. Accordingly, on the basis of the information gathered in these preliminary investigations, we find a reasonable indication of material injury to the domestic industry producing bulk ibuprofen.

App. 2097 (footnote omitted). As demonstrated by this finding, the ITC relied upon a number of reasons for its determination that the domestic industry had been affected and thus that Ethyl had suffered material injury. The record reflects that the ITC was aware that Ethyl's research costs were high during the first six months of 1991. App. 2048 (Redacted Post Conference brief of Cheminor before the ITC).16 Moreover, the ITC found that the market share and domestic consumption of Cheminor's ibuprofen contributed to its determination that there was material injury to the domestic industry.

The Acting Chairman of the ITC, Anne Brunsdale, did not join the reasoning in the "Views of the Commission" on the issue of material injury to the domestic industry. Brunsdale thus filed "Additional Views," in essence, a concurring opinion to the "Views of the Commission." Brunsdale also found that there was material injury to the domestic industry, but she did not rely upon Ethyl's assertions of decreased profits that Cheminor has alleged to be false.

_____

16. Ethyl noted in its brief that despite attempts to obtain an unredacted version of the Post Conference brief, Cheminor did not produce it. Nevertheless, it appears from the redacted version that Cheminor argued to the ITC that it should consider that Ethyl's research costs were higher than normal during the first six months of 1991.

14

Instead, she gave three reasons for her material injury determination: (1) the Indian imports are a suitable substitute for domestic ibuprofen; (2) "the alleged dumping and subsidy margins in these investigations are quite high;" and (3) the share of the U.S. market held by Indian ibuprofen "was not small enough, when combined with other factors, to ensure that there is no material injury [to the domestic market] by reason of the `unfair' imports." App. 2105-08. Brunsdale had knowledge of Ethyl's financial condition, but she did not find it to be determinative in light of the other factors indicating that the domestic industry was affected by Cheminor imports of ibuprofen.17

Thus, all ITC Commissioners, albeit in separatefindings, determined that Ethyl had suffered material injury by Cheminor's imports based on factors other than Ethyl's profitability.18

_____

17. We note here that the dissent, in referring to the view of Acting Chairman Anne Brunsdale, does not refute the fact that Brunsdale did not rely on Ethyl's assertions of decreased profits. Commissioner Brunsdale's separate opinion itself provides evidence of Ethyl's probable cause to file its ITC petition. Indeed, the dissent nowhere even acknowledges that the standard of probable cause as announced by the Supreme Court in PRE, 508 U.S. at 62-63, is the crucial test in the determination of the applicability of Noerr-Pennington immunity, as we have pointed out. See supra pp. 7-8. Rather, the attempt by the dissent to structure a wholly separate exception to Noerr-Pennington for fraud or misrepresentation, which is nowhere found in the jurisprudence, cannot take the place of PRE's required probable cause standard. Thus, the question to be answered in this case under the controlling standard is whether by reason of Ethyl's success in having the USTR remove Indian ibuprofen from the General System of Preferences list, Cheminor's receipt of subsidies from India, Cheminor's dumping of ibuprofen in the United States at less than fair value, and the harm and threat of harm to Ethyl by reason of Cheminor's dumping, Ethyl had probable cause to file an AD/CVD petition.

18. The dissent has not recognized that misrepresentations, if indeed they occurred, must be material to be acknowledged in the Noerr-Pennington context, as we have established. See supra pp. 9-10. Even if misrepresentations had been made such that Ethyl's allegations regarding its January through June 1991 profitability were unsupported, they were not deemed material in the opinions of the Commissioners.

15

Our review of the ITC and Brunsdale's analyses, in conjunction with the uncontested DOC preliminary determinations of 43.71% subsidization and 115.42% dumping margin, leads us to the conclusion that not only did Ethyl have probable cause to file its petition, but that substantial record evidence supported the ITC's preliminary determination of material injury. Thus, Ethyl's AD/CVD petition was not objectively baseless and the alleged misrepresentations, even if made, did not taint the"core" of Ethyl's AD/CVD petition. Accordingly, the sham exception to the Noerr–Pennington doctrine has no application to Ethyl's petition, and Ethyl is entitled to First Amendment immunity from antitrust liability for its petition to the ITC and DOC.

Moreover, the record reveals that in 1988, Ethyl had made a request to United States Trade Representative ("USTR") that the USTR remove Indian ibuprofen from the General System of Preferences ("GSP") list–– a list that contains products that are not charged duties upon arrival in the United States. USTR declined to do so in 1988 because Cheminor's impact on the U.S. market was slight in 1988. App. 1316. Ethyl renewed its request in 1990 asking then that the USTR remove Indian ibuprofen from the GSP. At that time, USTR granted Ethyl's request because of Indian ibuprofen's "potential impact on U.S. producers." App. 1445. This latter action by USTR might well be inferred to have given Ethyl probable cause to seek further remedies available by petition from the United States Government to support Ethyl's continued concern about Indian ibuprofen.19

In determining Ethyl's "objective basis for filing its petition," we also cannot ignore the fact that Ethyl posited a "threat" of material injury in addition to its present material injury. The ITC, as we have discussed, considered only Ethyl's present material injury, which we have held provided Ethyl with a sufficient objective basis for its AD/CVD petition, satisfying the Supreme Court's test. We recognize, however, that had the ITC made a contrary

_____

19. Again, the dissent fails to recognize that the USTR's actions gave Ethyl probable cause to file its AD/CVD petition.

16

finding as to actual material injury, it would have been obliged to address Ethyl's claimed "threat" to its ibuprofen sales. If that endeavor had been necessary, the ITC determination of "threat" would not have required any consideration by the ITC of the domestic industry's (i.e., Ethyl's) present profitability, 19 U.S.C. S 1677(7)(F)(i)(I)-(F) -- the one issue to which Cheminor has called attention. Hence, even if the ITC had not found present material injury based upon Ethyl's claims, the threat of material injury stemming from Indian subsidization and dumping at less than fair value in the future would have more than sufficed to justify Ethyl's petition. Significantly, Cheminor failed to adequately rebut Ethyl's threatened injury.

V.

Because we hold that Cheminor has not satisfied the first step of PRE's sham exception to the Noerr-Pennington doctrine, we have no need to address the question of whether Ethyl had a subjective intent to abuse government process.20

VI.

While the district court did not err in granting Noerr-Pennington immunity to Ethyl, it did err in dismissing Cheminor's state law claims on the ground that the court lacked subject matter jurisdiction. Both Ethyl and Cheminor agree that the District Court had subject matter jurisdiction over Cheminor's state law claims under 28 U.S.C. S 1332 because the parties are diverse 21 and the amount in controversy exceeded $75,000. However, Ethyl

_____

20. Cheminor requested discovery from Ethyl regarding issues of Ethyl's intent. Discovery motions were pending at the time the district court granted Ethyl's motion for summary judgment. In light of our affirmance of the District Court's opinion on the ground that Ethyl had an objective basis to file its petition, discovery issues as to Ethyl's subjective intent
are neither relevant nor material.

21. The complaint states that Cheminor Drugs is an Indian company; that Reddy-Cheminor is a New Jersey corporation; and that Ethyl is a Virginia corporation.

urges us to affirm dismissal of Cheminor's state law claims on another ground, namely, that Ethyl is entitled to Noerr–Pennington immunity for the state claims that Cheminor has asserted, in the same fashion as Noerr-Pennington applies to the federal antitrust claims.

Specifically, Cheminor has alleged tort claims under New Jersey common law for malicious prosecution, tortious interference with contract, tortious interference with prospective economic advantage, and unfair competition. Although New Jersey has not yet decided whether the Noerr-Pennington doctrine "extends beyond antitrust law to tort liability," Snyder v. American Ass'n of Blood Banks, 144 N.J. 269, 296 (1996), we have been presented with no persuasive reason why these state tort claims, based on the same petitioning activity as the federal claims, would not be barred by the Noerr–Pennington doctrine.

Indeed, at least two New Jersey District Courts have held that entry of summary judgment for a defendant on federal antitrust claims requires that summary judgment be entered for the defendant on state antitrust claims. Inter-City Tire & Auto Ctr., Inc. v. Uniroyal, Inc., 701 F. Supp. 1120, 1124–25 (D.N.J. 1988), aff'd, 888 F.2d 1380 (3d Cir. 1989); Regency Oldsmobile, Inc. v. General Motors Corp., 723 F. Supp. 250, 270 (D.N.J. 1989). We are persuaded that the same First Amendment principles on which Noerr–Pennington immunity is based apply to the New Jersey tort claims. See Brownsville Golden Age Nursing Home, Inc. v. Wells, 839 F.2d 155, 1159–60 (3d Cir. 1988) (Sloviter, J.) (holding that Noerr-Pennington immunity precludes tort liability for reporting nursing home violations to government authorities under Pennsylvania law); 22 see also

_____

22. Although the dissent argues that Brownsville did not "extend the Noerr-Pennington doctrine to state or common law claims," Dissent at 31, the court in Brownsville did in fact rely on several Noerr doctrine cases to support its holding rejecting a cause of action for malicious interference with business relations. In Brownsville, the court stated:

     Two lines of cases support the Sierra Club decision and that which
     we uphold here: the defamation cases . . . and the Noerr–Pennington
     cases teaching that the collusive use by competitors of legislative,
     administrative, or judicial process does not, without more, give rise

Whelan v. Abell, 48 F.3d 1247, 1254 (D.C. Cir. 1995) ("[I]t
is hard to see any reason why, as an abstract matter, the
common law torts of malicious prosecution and abuse of
process might not in some of their applications be found to
violate the First Amendment") (District of Columbia law);
Kottle v. Northwest Kidney Ctrs., 146 F.3d 1056, 1059 (9th
Cir. 1998) (Washington state antitrust law covered by Noerr-
Pennington). We thus will affirm summary judgment for
Ethyl on those claims as well as on the federal claims.23

_____

        to an anti-trust violation, see Eastern R.R. Conference v. Noerr
Motor
        Freight, 365 U.S. 127 (1961); California Motor Transport Co. v.
        Trucking Unlimited, 404 U.S. 508 (1972).

Brownsville, 839 F.2d at 160 (underlining added). The court went on to
cite to several relevant Noerr cases:

         In numerous cases, the courts have rejected claims seeking
        damages for injuries allegedly caused by the defendants' actions
        directed to influencing government action. See, e.g., State of
Missouri
        v. National Organization of Women, 620 F.2d 1301, 1317 (8th Cir.),
        cert. denied, 449 U.S. 842 (1980) (boycott campaign of NOW against
        states not ratifying the ERA was neither tortious nor prohibited by
        the Sherman Act because `the right to petition is of such
importance
        that it is not an improper interference even where exercised by way
        of a boycott'); Protect our Mountain Environment, Inc. v. District
Court,
        677 P.2d 1361, 1369 (Colo. 1984) (Noerr-Pennington analysis
        applicable to suit for abuse of process and civil conspiracy);
Rudoff
        v. Huntington Symphony Orchestra, Inc., 91 Misc.2d 264 (N.Y. Sup.
        1977) (`public policy dictates that the tort of interference not be
        extended to those situations where a citizen petitions an agency of
        his government'); Bledsoe v. Watson, 106 Cal. Rptr. 197 (Ct. App.
        1973) (`the benefit to the public interest in allowing free
challenges
        to public expenditures that may circumvent the electoral process
        outweighs any detriment that may result to private contracting
        parties from such challenges'). Brownsville has neither
distinguished
        these cases nor cited any authority to support its underlying
action.
        . . .

Id.

23. After the district court improperly dismissed the state claims in this
action, Cheminor refiled its common law state claims in New Jersey state

court. Ethyl removed that case to federal court. The District Court administratively dismissed this second-filed case pending the outcome of this appeal. Because we are affirming the District Court's judgment in the instant case and are holding that Noerr-Pennington applies to the state law claims, those claims would be subject to a res judicata defense. Fed. R. Civ. P. 8(b).

19

VII.

We will affirm the District Court's judgment of February 5, 1998, which granted Ethyl's motion for summary judgment.

20

SLOVITER, Circuit Judge, dissenting.

I dissent from the decision of the majority for two reasons. First, I believe the majority errs as a matter of law in its reading of the sham exception to the Noerr-Pennington doctrine, and thereby diminishes by judicial interpretation the scope of the Sherman Act, a seminal congressional enactment. Second, I believe the facts of record are sufficient to withstand summary judgment.

I will not repeat in detail the historical facts outlined by the majority. For our purposes, it is sufficient to recognize that appellant Cheminor, an Indian manufacturing company, began exporting bulk ibuprofen for sale in the United States in 1988, which would have created competition for appellee Ethyl, who was at that time the only U.S. manufacturer of bulk ibuprofen.

Ethyl began taking steps to impede Cheminor's entry into the U.S. market. In addition to filing a petition with the U.S. Trade Representative (USTR), seeking to remove Indian ibuprofen from the list of eligible articles, which was ultimately successful effective July 1, 1991, it also filed an anti-dumping (AD) and countervailing duty (CVD) petition with the United States International Trade Commission (USITC) and the United States Department of Commerce (USDOC) accusing Cheminor of receiving generous subsidies from the Indian government and selling bulk ibuprofen on the U.S. market at below market prices. The USITC, which has only 45 days to make a preliminary determination whether, based on the best information available at the time, there is a reasonable indication of material injury to a domestic industry, or threat thereof, by reason of the imports under investigation, see 19 U.S.C. S 1671b(a), made a preliminary determination on September 16, 1991, that there was sufficient evidence of material injury to the domestic market to justify taking corrective action against Cheminor. On December 13, 1991, the USDOC preliminarily determined that the Indian government had been subsidizing Cheminor in the amount of 43.71%. As a result of these two determinations, the USITC and/or USDOC required Cheminor's exclusive distributor, Flavine International ("Flavine"), to pay 43.71% duties on any Cheminor ibuprofen imported.

21

In response to this significant additional cost, Flavine canceled all orders for bulk ibuprofen. This effectively forced Cheminor out of the U.S. ibuprofen market. Cheminor notified the USITC that it would be withdrawing from the market. Only after Cheminor withdrew did Ethyl voluntarily withdraw its USITC petition.

Cheminor then filed this lawsuit against Ethyl. The District Court granted Ethyl's motion for summary judgment on the antitrust claims on the ground that Ethyl was immune from suit under the First Amendment and the Noerr-Pennington doctrine. It dismissed Cheminor's state law claims under 28 U.S.C. S 1367 (c), refusing to exercise supplemental jurisdiction as a matter of discretion.

I

LEGAL ISSUE: TREATMENT OF FRAUD UNDER
NOERR-PENNINGTON

Under the majority's decision, even a party who has committed blatant and intentional fraud and misrepresentation in a judicial or administrative proceeding is entitled to the protection that the Noerr-Pennington doctrine affords from suit under the antitrust laws. I do not believe that Noerr-Pennington goes as far as to cover abuse of process; I do not believe that it should.

The rationale given by the Supreme Court for its holding in Eastern Railroad Presidents Conference v. Noerr Motor Freight, Inc., 365 U.S. 127, 135 (1961), that"no violation of the [Sherman] Act can be predicated upon mere attempts to influence the passage or enforcement of laws," was the dissimilarity between an agreement to lobby for legislation and an agreement to price-fix or boycott, id. at 137, the concern about impairing the ability of persons to make known their wishes to their legislators, id., the unwillingness to apply the Sherman Act to political activity, id., and the First Amendment protection of the right to petition, id. at 137-38. This holding was extended to attempts to influence the executive branch, specifically the Secretary of Labor, in United Mine Workers of America v. Pennington, 381 U.S. 657 (1965). Yet another extension was

22

added in California Motor Transport Co. v. Trucking Unlimited, 404 U.S. 508, 510-11 (1972), when the Court ruled that citizens' attempts to influence administrative agencies or courts similarly may not engender antitrust liability. The majority relies upon this doctrine in holding that Cheminor cannot base its antitrust claims on Ethyl's attempts to influence the USITC and USDOC.

However, the Noerr-Pennington exception to the antitrust laws is not unlimited. The Court in Noerr made that clear when it stated, "There may be situations in which a publicity campaign, ostensibly directed toward influencing governmental action, is a mere sham to cover what is actually nothing more than an attempt to interfere directly with the business relationship of a competitor and the application of the Sherman Act would be justified," thereby describing what has come to be known as the "sham" exception. 365 U.S. at 144.

Thereafter, in holding that because of the sham exception the antitrust laws applied to the conduct of highway carriers who allegedly engaged in concerted action to institute state and federal proceedings to resist and defeat applications by competitive highway carriers to acquire, transfer or register those rights, the Supreme Court held that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." California Motor Transport, 404 U.S. at 513. If the activity were proven, the antitrust laws would apply.

Thus, I believe, and there are cases so holding, that the "sham" exception to Noerr-Pennington immunity from the antitrust laws includes at least two separate and independent grounds for holding that a particular litigant is not immune from antitrust liability: (1) that the litigation was objectively baseless, and (2) that the litigation was based on knowing and material misrepresentations. The District Court never considered whether Ethyl's AD/CVD petition might be a sham based on the second ground. The majority holds this was not error, and in doing so relies on the Supreme Court's most recent decision on this subject.

In Professional Real Estate Investors, Inc. v. Columbia Pictures Industries, Inc., 508 U.S. 49 (1993) (PRE), the

23

Court, in "defin[ing] the `sham' exception to the doctrine of antitrust immunity first identified in [Noerr] as that doctrine applies in the litigation context," held that "litigation cannot be deprived of immunity as a sham unless the litigation is objectively baseless." Id. at 51. The majority reads that as holding that "objective baselessness" is the only exception to Noerr-Pennington. However, nothing in PRE repudiated the holding in California Motor Transport. Rather, the PRE Court expressly reserved the question whether and to what extent the test it announced would apply in the event that the litigation involved misrepresentations or other highly disfavored conduct. It stated:

> In surveying the "forms of illegal and reprehensible practice which may corrupt the administrative or judicial processes and which may result in antitrust violations," we have noted that "unethical conduct in the setting of the adjudicatory process often results in sanctions" and that "[m]isrepresentations, condoned in the political arena, are not immunized when used in the adjudicatory process." California Motor Transport, 404 U.S., at 512-513. We need not decide here whether and, if so, to what extent Noerr permits the imposition of antitrust liability for a litigant's fraud or other misrepresentations.

PRE, 508 U.S. at 61 n.6 (citations omitted).

The majority's decision to disregard the facts that Cheminor alleges Ethyl misrepresented is contrary to the position of the two other courts of appeals that have considered this issue. Both of these courts read PRE to preserve a fraud exception to antitrust immunity, although they vary in their interpretation of that exception. See Whelan v. Abell, 48 F.3d 1247, 1254-55 (D.C. Cir. 1995); Kottle v. Northwest Kidney Centers, 146 F.3d 1056, 1060 (9th Cir. 1998), petition for cert. filed 67 U.S.L.W. 3364 (U.S. Nov. 17, 1998) (No. 98-810).

For example, the Court of Appeals for the District of Columbia has held that litigation that is based on misrepresentations does not enjoy immunity either under Noerr-Pennington or under the First Amendment. In Whelan, the district court had dismissed the antitrust

24

complaint on the grounds that the defendants were immune from liability under Noerr–Pennington because the litigation they pursued was not objectively baseless. See 48 F.3d at 1253. In reversing that decision, the appellate court agreed with the plaintiffs that, even if the litigation was not baseless, the defendants were not entitled to immunity if they made deliberately false and material representations in the course of that litigation. The court reasoned that because Noerr–Pennington immunity is based, at least in part, on respect for the First Amendment right to petition for redress of grievances, and because "[h]owever broad the First Amendment right to petition may be, it cannot be stretched to cover petitions based on known falsehoods," it followed that Noerr–Pennington did not immunize the defendants from liability based on their misrepresentations. Id. at 1254–55.

A fraud exception to Noerr–Pennington in the litigation context was also recognized in Kottle, where the Ninth Circuit stated, "[I]n the context of a judicial proceeding, if the alleged anticompetitive behavior consists of making intentional misrepresentations to the court, litigation can be deemed a sham if `a party's knowing fraud upon, or its intentional misrepresentations to, the court deprive the litigation of its legitimacy.' " 146 F.3d at 1060 (quoting Liberty Lake Inv., Inc. v. Magnuson, 12 F.3d 155, 158–59 (9th Cir. 1993)).

The majority relegates these cases to a footnote for the proposition that the misrepresentation must be material, without acknowledging that the Ninth and District of Columbia Courts of Appeals, unlike it, accept misrepresentation as an independent prong of the sham exception to Noerr–Pennington. By thus conflating the concepts of "material" and "objectively baseless," the majority ignores the risk that a party will intentionally use fraud and misrepresentation to transform a claim that is otherwise weak and unlikely to prevail, although not "objectively baseless," into one that succeeds.

Given the cited appellate authority, it is inexplicable to me why the majority has chosen to rely for its precedent on the district court decision in Music Center S.N.C. DiLuciano Pisoni & C. v. Prestini Musical Instruments Corp., 874 F.

25

Supp. 543 (E.D.N.Y. 1995). In that case, the court refused to permit plaintiffs to proceed to discovery in an antitrust claim based on material misrepresentations without first establishing a colorable claim that the challenged litigation was objectively baseless.

Many of the arguments made by the majority are effectively answered in Clipper Exxpress v. Rocky Mountain Motor Tariff Bureau, Inc., 690 F.2d 1240 (9th Cir. 1982), a case in which the court reversed the summary judgment granted to defendant trucking companies and their rate bureau, who had filed protests with the Interstate Commerce Commission with regard to the plaintiff 's shipping rates. The Court of Appeals rejected the defendants' attempts to cloak themselves with the mantle of Noerr-Pennington immunity, noting that, unlike in the political arena, immunizing defendants from liability based on misrepresentations made in an adjudicatory context could undercut the effectiveness of the adjudicatory body. It explained:

> There is an emphasis on debate in the political sphere, which could accommodate false statements and reveal their falsity. In the adjudicatory sphere, however, information supplied by the parties is relied on as accurate for decision making and dispute resolving. The supplying of fraudulent information thus threatens the fair and impartial functioning of these agencies and does not deserve immunity from the antitrust laws.

Id. at 1261.

To follow further the Clipper court's distinction between petitioning the legislature and petitioning a court, I quote from other pertinent language in the opinion:

> Adjudicatory procedures will not always ferret out misrepresentations. Administrative bodies and courts . . . rely on the information presented by the parties before them. They seldom, if ever, have the time or resources to conduct independent investigations. The recognition, however, of a private right of action based on the fraudulent misrepresentation, might be sufficient incentive to induce parties not to fraudulently misrepresent facts.

26

Id. at 1262. Moreover, the Clipper court, like the court in Whelan, noted that the First Amendment does not protect such false petitioning:

> There is no first amendment protection for furnishing with predatory intent false information to an administrative or adjudicatory body. The first amendment has not been interpreted to preclude liability for false statements.

Id. at 1261.

Unlike the majority, I conclude that the District Court erred in recognizing only a single exception to Noerr–Pennington immunity based on "objective baselessness," and would remand to that court for further consideration.

II

IS THERE SUFFICIENT FACTUAL BASIS OF FRAUD AND MISREPRESENTATION TO WITHSTAND SUMMARY JUDGMENT?

Cheminor has raised sufficient questions of fact to survive summary judgment under the "sham" exception as I have delineated it. Cheminor alleges that when Ethyl filed the AD/CVD petition, it knew it would not be able to establish all of the elements of an antidumping or countervailing duty claim, and intentionally and materially misrepresented its financial condition in order to overcome this difficulty. It alleges that Ethyl misrepresented, inter alia, (1) Ethyl's profits and costs,[1] (2) the customers Ethyl allegedly lost to Cheminor, and (3) specific sales Ethyl allegedly lost to Cheminor. Because Cheminor has submitted some evidence to support these allegations, I, like the majority, must assume that the statements Cheminor alleges were false are, in fact, false. I conclude

_____

1. In addition to its contention that Ethyl misrepresented data for the first six months of 1991, Cheminor also contends that Ethyl "intentionally and wrongfully underreported its profits to the ITC by $1.5 million dollars (over three years)" and that Ethyl misrepresented its 1990 profits. Appellants' Br. at 14, 16.

27

that these misrepresentations were sufficiently material to bring them within the sham exception to Noerr-Pennington immunity.

To prevail in the AD/CVD case, Ethyl had to show that Cheminor received government subsidies, it sold the product at less than fair value, there was material injury to the domestic industry, and this injury was by reason of Cheminor's exports. A failure to show any one of these elements would have defeated Ethyl's claim. A misrepresentation was thus material to the extent that the truth would have tended to disprove the existence of any one of the elements.

Cheminor contends that Ethyl's misrepresentations were material to the USITC's determination that material injury to the domestic industry probably had occurred. In making that determination, the USITC must by statute consider "(I) the volume of the imports of the subject merchandise, (II) the effect of the imports of that merchandise on prices in the United States for domestic like products, and (III) the impact of imports of such merchandise on domestic producers of domestic like products . . . ." 19 U.S.C. S 1677(7)(B)(I). Further, in assessing the impact imports have had on domestic producers, the USITC must consider "all relevant economic factors which have a bearing on the state of the industry in the United States," which in this case was Ethyl. 19 U.S.C. S 1677(7)(C)(iii). The USITC was specifically directed to consider:

> (I) actual and potential decline in [Ethyl's] . . . sales [and] profits, . . .
>
> (II) factors affecting [Ethyl's] prices,
>
> (III) actual and potential negative effects on [Ethyl's] cash flow, . . .
>
> (IV) actual and potential negative effects on [Ethyl's] existing development and production efforts . . ., and
>
> (V) . . . the magnitude of the margin of dumping.

Id. The misrepresentations Cheminor alleges Ethyl made directly concern Ethyl's sales, profitability, prices, and cashflow -- three of the five statutorily-mandated indicia of

28

injury. By law, they were thus material to the USITC's decision making.

Moreover, as even the majority admits, the USITC actually "relied . . . in part on Ethyl's representations of its financial condition" in determining that Ethyl's application justified imposing punitive tariffs on Cheminor. The USITC stated in its "Views of the Commission":

> The financial trends provide a reasonable indication of present material injury. For example . . . the industry [Ethyl's] profitability (as measured by profit-to-sales ratio) declined substantially from the beginning to the end of the investigatory period, despite an increase in 1989 from the 1988 level.
>
> Confidential information concerning other factors, such as apparent domestic consumption and market share, further provide a reasonable indication of present injury.

App. at JA 2097 (footnote omitted).

The fact that the USITC also relied on other factors, such as Cheminor's market share, in reaching its determination cannot disprove the materiality of the misrepresentations. Neither Ethyl nor the majority have suggested any reason to believe that the USITC would not have reconsidered its decision had it known that Cheminor's financial condition was improving. The USITC might have decided that strong evidence of a financially healthy domestic industry outweighed any data suggesting that Cheminor's market share was increasing. Ethyl's misrepresentations deprived the USITC of that opportunity, undermining the legitimacy of its decision making process.

Nor can Ethyl refute the materiality of the alleged misrepresentations by claiming that the USITC could have based its determinations on the threat of material injury. Ethyl admits that neither the District Court nor the USITC considered whether the evidence it submitted established a colorable claim of threat of harm. The fact that the misrepresentations might not have been material to a determination the USITC concededly did not make says little about whether the same misrepresentations affected

29

the determination it concededly did make. Similarly, the USTR's decision to remove Indian ibuprofen from the GSP in 1990 is irrelevant to the determination whether Ethyl's alleged misrepresentations affected the USITC's decision.

The majority, apparently in an attempt to negate materiality, notes that Acting Chairman Anne Brunsdale, writing separately, "did not rely on Ethyl's assertions of decreased profits" in reaching her decision. An individual Commissioner's views do not in any way indicate that the misrepresented facts were not material to the other Commissioners or to the Commission's decision. In any event, even Acting Chairman Brunsdale said she found Ethyl's financial information "useful in determining whether the injury resulting from any dumping and subsidization is material." App. at JA 2105.

The majority's suggestion that the alleged misrepresentations are not material because "they were deemed to be not material by the ITC" is even less persuasive. The Commissioners had not learned of the falsity of Ethyl's representations at the time they reached their decision and thus they had no opportunity to judge their materiality. I can only assume that the majority means to say that the Commissioners did not deem Ethyl's profitability figures to be material in reaching a decision. As I explain above, I find this interpretation of the Commissioners' actions untenable.

Of more concern is the majority's apparent belief that the issue turns on whether Ethyl had probable cause tofile its petition. As I have explained, a party's use of material misrepresentations in filing an action is a separate and independent ground for denying Noerr-Pennington immunity.

Finally, I note that the majority extends Noerr-Pennington immunity beyond the antitrust context, and holds it also governs Cheminor's state common law claims. This court has not previously so held, and I believe we should not expand the scope of Noerr-Pennington immunity to cover claims of any variety -- common law or statutory, federal or state -- without significantly more consideration than the majority devotes to this issue. See Whelan, 48 F.3d at

30

1253–55 (identifying concerns raised by the application of Noerr–Pennington defense to common law claims without deciding whether such application is mandated by the First Amendment).

I see no need to engage in a monologue on that issue in the posture of this case. I do note that the case the majority refers to for its expansion of the Noerr–Pennington doctrine, Brownsville Golden Age Nursing Home, Inc. v. Wells , 839 F.2d 155, (3d Cir. 1988), which (perhaps not coincidentally) I authored, did not purport to extend the Noerr–Pennington doctrine to state or common law claims; it merely held that "action designed to bring a facility's noncompliance with applicable regulations to the attention of the appropriate authorities" cannot form the basis of a damage action, and drew analogies to cases rejecting claims based on petitioning activity. That can hardly be used as support for the majority's very different determination that fraudulent action, designed to elicit administrative action, is immune from any liability, whether under federal, state, statutory or common law.

Whether Cheminor's state law claims fall within an exception to the Noerr–Pennington doctrine turns on precisely the same considerations as the determination whether its federal claims fall within that exception. Because I disagree with the majority's conclusion that Ethyl is entitled to immunity from Cheminor's antitrust claims and its state law claims, I respectfully dissent.

A True Copy:
Teste:

        Clerk of the United States Court of Appeals
        for the Third Circuit

31